**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| William Masten and Catherine McAlister, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  vs.<br><br>Metropolitan Life Insurance Company, the Metropolitan Life Insurance Company Employee Benefits Committee, and John/Jane Does 1-20,<br><br>    Defendants. | Civil Action No. 18-cv-11229-RA<br><br><br><br><br><br><br>CLASS ACTION |

**AMENDED COMPLAINT**

Plaintiffs William Masten and Catherine McAlister, by and through their attorneys, on behalf of themselves and all others similarly situated, based on personal knowledge with respect to their own circumstances and based upon information and belief pursuant to the investigation of their counsel as to all other allegations, allege the following.

**INTRODUCTION**

1. This is a class action against Defendants, Metropolitan Life Insurance Company ("Metropolitan"), the Metropolitan Life Insurance Company Employee Benefits Committee (the "Committee"), and the individual members of the Committee (collectively with Metropolitan and the Committee, the "Defendants"), concerning the failure to pay alternative benefits under the defined benefit Metropolitan Life Retirement Plan (the "Plan") in amounts that are actuarially equivalent to the Plan's normal forms of retirement benefits as required by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA") and the terms of

the Plan itself.  By not offering alternative benefits that are actuarially equivalent to the Plan's normal forms of retirement benefits, Metropolitan is causing retirees to lose part of their vested retirement benefits in violation of ERISA.

2.      The Plan has several formulae for how participants earn retirement benefits.  Under the Plan's traditional formula (the "Traditional Part") and the parts applicable to employees of GenAmerica Corporation ("GenAm Part") and New England Life Insurance ("NEF Part"), participants earn a retirement benefit in the form of a single life annuity ("SLA") based on their final average compensation and years of service.  Under those parts of the Plan, Metropolitan offers several forms of benefits other than an SLA, including "certain and life annuities" which provide a participant (and a beneficiary) benefits for at least a specified minimum period, *e.g.* 5 years, regardless of how long the participant lives; first-to-die annuities; and "joint and survivor annuities," which are payment streams for their life and their spouse's life after the retiree dies, commonly expressed as a percentage of the benefit paid during the retiree's life (collectively, "Non-SLA Annuities").

3.      To calculate the amounts of the Non-SLA Annuities, actuarial assumptions are applied to calculate the present value of the future payments.  These assumptions are based on a set of mortality tables and interest rates.  The mortality table and interest rate ***together*** are used to calculate a "conversion factor" which determines the amount of the Non-SLA Annuities that would be equivalent to the SLA the participant accrued under the Plan.  The present values of the Non-SLA Annuities and the SLA must be equal for the forms of payment to be "actuarially equivalent."

4.      Mortality rates have generally improved over time with advances in medicine and better collective lifestyle habits.  People who retired recently are expected to live longer than those who retired in previous generations. Older morality tables predict that people will die at a faster

rate than current mortality tables. As a result, using an older mortality table to calculate a conversion factor decreases the present value of the Non-SLA Annuities and—interest rates being equal—the monthly payment retirees receive.

5.      The interest rate also affects the calculation. Using lower interest rates—mortality rates being equal—decreases the present value of the Non-SLA Annuities and the amount of the monthly payment.

6.      Defendants calculate the conversion factor (and thus the value of the Non-SLA Annuities) for the Traditional Part and the GenAm Part using the 1971 Group Annuity Mortality Table for Males (the "1971 GAM Table"), set back one year for participants and set back five years for beneficiaries and a 6% interest rate.  For the NEF Part, Defendants use the 1983 Group Annuity Table ("1983 GAM Table") for males set-back one year and a 5% interest rate.  Because both sets of assumptions rely on outdated mortality rates, they depress the present value of the Non-SLA Annuities, resulting in benefits are materially *lower* than they would be if the Defendants used reasonable, current actuarial assumptions.  Defendants' use of outdated actuarial assumptions causes participants who elect the Non-SLA Annuities to receive lower monthly benefits than they should and to forfeit part of their vested benefits in violation of ERISA.

7.      Defendants similarly use outdated actuarial assumptions when calculating certain forms of benefits under the Plan's cash balance part (the "Cash Balance Part").  Under the Cash Balance Plan, participants have a hypothetical account to which Metropolitan contributes and interest accrues.  When calculating a participant's benefits, Metropolitan converts the account balance to a 5 Year Certain and Life Annuity ("5YCLA") using the actuarial assumptions set forth in Internal Revenue Code § 417(e) which use current mortality assumptions and market interest rates.  If, however, participants in the Cash Balance Part elect to receive their benefit as a certain

and life annuity in a duration other than 5 years or a joint and survivor annuity, Metropolitan converts the 5YCLA (to which reasonable actuarial assumptions have already been applied) to one of those other forms using the 1971 GAM table with setbacks and a 6% interest rate. As described above, these assumptions reduce the present value of those alternative forms and cause retirees not to receive an actuarially equivalent benefit.

8.     In sum, Defendants caused Plaintiffs and Class Members to unknowingly forfeit and lose part of their vested benefits in violation of ERISA's anti-forfeiture rule. *See* ERISA § 203(a), 29 U.S.C. § 1053(a). By using outdated mortality assumptions, Defendants reduced the present value of Plaintiff McAlister's benefits by $7,459 and Plaintiff Masten's benefits by $7,385. These improper reductions cause Plaintiffs and other participants and beneficiaries of the Plan to receive less than they should as a pension every month and will continue to affect them throughout their retirements.

9.     Accordingly, Plaintiffs seek an Order from the Court reforming the Plan to conform to ERISA, payment of future benefits in accordance with the reformed Plan, as required under ERISA, payment of amounts improperly withheld, and such other relief as the Court determines to be just and equitable.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of the ERISA.

11.     This Court has personal jurisdiction over Metropolitan because it is headquartered and transacts business in, or resides in, and has significant contacts with this District, and because ERISA provides for nationwide service of process.

12.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and Metropolitan resides and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Metropolitan does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiffs

13.     Plaintiff William Masten is a resident of Spokane, Washington, and a Participant in the Plan.  Mr. Masten worked for Metropolitan for over 32 years until he retired in 2012, accruing a benefit under the formula in the Plan's Traditional Part.  Under the terms of the Plan, Mr. Masten and his wife receive a joint and survivor retirement annuity.

14.     Plaintiff Catherine McAlister is a resident of Jacksonville, Florida and a Participant in the Plan.  Ms. McAlister worked for Metropolitan or its affiliates, including New England Life Insurance, for approximately 40 years until she retired in December 2014, accruing benefits under the Plan's Traditional Part and the NEF Part.  Ms. McAlister and her husband receive separate joint and survivor retirement annuities under the Traditional Part and the NEF Part.

### Defendants

15.     Metropolitan is among the largest providers of insurance, annuities and employee benefit programs in the U.S. Its headquarters and principal place of business is New York, New

York.  Metropolitan is the sponsor of the Plan, and the Plan names Metropolitan as the administrator of the Plan.

16.     The Committee has fiduciary responsibility for the administration and operation of the Plan, as set forth in the Plan document.  The Committee is a named fiduciary in the Plan and is a fiduciary for the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercises discretionary authority or control respecting the management of the Plan and the management or disposition of its assets.

17.     John/Jane Does 1 through 20 are the individual members of the Committee, or any other committee(s) responsible for administering the Plan.  Their names and identities are not currently known.

## APPLICABLE ERISA REQUIREMENTS

### *Benefit Options*

18.     ERISA requires that benefits from a defined benefit plan be paid to married Participants in the form of a qualified joint and survivor annuity (a "QJSA") unless the Participant, with the consent of his or her spouse, elects an alternative form of payment, making the QJSA the default benefit for employees who are married.  *See* ERISA § 205(a) and (b), 29 U.S.C. § 1055(a) and (b).

19.     A QJSA is an annuity for the life of the plan participant with a survivor benefit for the life of the spouse that is not less than 50%, and not greater than 100% of the annuity payable during the joint lives of the participant and the spouse.  ERISA § 205(d)(1), 29 U.S.C. § 1055(d)(1). For example, if a Participant receives $1,000 per month under a 50% joint and survivor annuity, the spouse will receive $500 a month after the Participant's death. Under each part of the Plan, the QJSA is a 50% JSA.

20.     Pension plans may also offer Participants alternative forms of survivor annuities, known as qualified optional survivor annuities ("QOSA"). *See* ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2); *see also* 26 U.S.C. § 417(g). Some common forms of QOSAs are "certain and life" annuities, whereby a participant (and beneficiary) receives benefits for at least a specified minimum number of years, regardless of how long the participant lives and First-To-Die annuities, which are similar to QJSAs except that the "survivor" benefit begins for the remaining spouse once *either* the participant *or* the participant's spouse dies.

21.     ERISA also requires that defined benefit plans provide a qualified pre-retirement survivor annuity ("QPSA"). ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2). A QPSA is an annuity for the life of the participant's surviving spouse (*i.e.*, a beneficiary) if the participant dies before reaching the plan's normal retirement age. ERISA § 205(e), 29 U.S.C. § 1055(e).

### Benefit Options Must Be Actuarially Equivalent

22.     "If an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . *shall be the actuarial equivalent of such benefit* . . . ." 29 U.S.C. § 1054(c)(3) (emphasis added).

23.     A QJSA must be actuarially equivalent to a single life annuity ("SLA"). *See* 29 U.S.C. § 1055(d)(1); 26 U.S.C. § 417(b).

24.     The Treasury regulations for the Internal Revenue Code (the "Tax Code") provision corresponding to ERISA § 205 (26 U.S.C. § 401(a)(11)), similarly provide that a QJSA "must be at least the actuarial equivalence of the normal form of life annuity or, if greater, of any optional

form of life annuity offered under the plan."[1] Indeed, a QJSA "must be as least as valuable as any other optional form of benefit under the plan at the same time."  26 C.F.R. § 1.401(a)-20 Q&A 16.

25.     ERISA and the Tax Code both require that a QOSA be actuarially equivalent to an SLA. *See* 29 U.S.C. § 1055(d)(2); 26 U.S.C. § 417(g).

26.     A QPSA must be actuarially equivalent to what the surviving spouse would have received under the plan's QJSA and any QOSAs.   ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

27.     ERISA does not require that pension plans offer lump sum distributions of vested benefits to retirees upon their retirement.  *See* ERISA § 205(g), 29 U.S.C. § 1055(g). However, if plans offer a lump sum distribution as an optional benefit, ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), requires that the present value of the lump sum be determined using the applicable mortality table (the "Treasury Mortality Table")[2] and applicable interest rate (the "Treasury Interest Rate")[3] (collectively, the "Treasury Assumptions"), which are set by the Secretary of the Treasury (the "Secretary") pursuant to IRC §§ 417(e) and 430(h) which are based on current market rates and mortality assumptions.  *See* 29 U.S.C. § 1055(g)(3)(B); 29 U.S.C. § 1083(h), 26 U.S.C. §§ 417(e) and 430(h). In other words, the lump sum distribution must be actuarially equivalent to the QJSA and QPSA.

---

[1] *See* 26 C.F.R. § 1.401(a)-11(b)(ii)(2). The term "life annuity" includes annuities with terms certain in addition to single life annuities. As the Treasury Regulations explain, "[t]he term 'life annuity' means an annuity that provides retirement payments and requires that survival of the participant or his spouse as one of the conditions for payment or possible payment under the annuity. For example, annuities that make payments for 10 years or until death, whichever occurs first or whichever occurs last, are life annuities."   26 C.F.R. § 1.401(a)-11(b)(1)(i)

[2] 26 C.F.R. § 1430(h)(2)-1

[3] 26 C.F.R. § 1430(3)-1

28.     ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is non-forfeitable.  ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), provides that if an employee's accrued benefit is in the form other than an SLA, the accrued benefit "shall be the actuarial equivalent" of an SLA.

29.     The Treasury regulation for the Tax Code provision corresponding to ERISA § 203 (26 U.S.C. § 411), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable."  26 C.F.R. § 1.411(a)-4(a).

### *Reasonable Factors Must Be Used When Calculating Actuarial Equivalence*

30.     "Two modes of payment are actuarially equivalent when their present values are *equal* under a given set of assumptions." *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added).[4]  Actuarial equivalence should be "cost-neutral," meaning that neither the Plan nor the participants should be better or worse off if the participant selects either the normal retirement benefit or an optional form of benefit. See *Osberg v. Foot Locker, Inc.*, 138 F. Supp. 3d 517, 540 (S.D.N.Y. 2015).

31.     Under ERISA, "present value" means "the value adjusted to reflect anticipated events.  Such adjustments shall conform to such regulations as the Secretary of the Treasury may prescribe." ERISA § 3(27), 29 U.S.C. § 1002(27). The Secretary has prescribed numerous regulations describing how present value should reasonably reflect anticipated events, including:

        (a)     The Treasury regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied *reasonable actuarial factors*, for each

---

[4] "Equivalent" means "equal." https://www.merriam-webster.com/dictionary/equivalent
"Equal" means the "same." https://www.merriam-webster.com/dictionary/equal

participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

    (b)    A plan must determine optional benefits using "a single set of ***interest and mortality assumptions that are reasonable*** . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

    (c)    With respect to benefits under a lump sum-based formula, any optional form of benefit must be "at least the actuarial equivalent, using ***reasonable actuarial assumptions*** . . . ." 26 C.F.R. § 1.411(a)(13)-1(b)(3) (emphasis added).

## SUBSTANTIVE ALLEGATIONS

**I.**    **The Plan**

    **A.**    **Overview**

32.    Metropolitan established the Plan to "provide[] a solid foundation on which to build your financial freedom." *See* the Plan's Summary Plan Description ("SPD"). Metropolitan sponsors the Plan.

33.    All Participants and beneficiaries of the Plan are current and former employees of Metropolitan, spouses of current and former employees, or other beneficiaries. Under the terms of the Plan, Participants are entitled to receive a monthly pension that begins at the Normal Retirement Date following the Participant's 65th birthday, although various early retirement options are available. *See* the Plan §§ 1.38, 5.3-B.

34.    The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

35.    The Plan is a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

36.     The Plan is administered by Metropolitan.  Metropolitan has delegated to the Committee the responsibility for carrying out at least some of its fiduciary responsibilities with respect to the Plan.

### B.     The Traditional Part

37.     From the Plan's inception until 2003, participants earned benefits under the Traditional Part.  The Traditional Part is a traditional defined benefit plan whereby participants earned a retirement benefit that is a percentage of their compensation multiplied by how many years they worked for Metropolitan.  *See* Plan Document at Appendix A, § 4.02-A.

38.     The Traditional Part's "normal retirement benefit" is an SLA.  *Id*.

39.     The Traditional Part defines the term "accrued benefit" as a 12-year life and certain annuity (a "12YCLA"), a benefit that the Plan provides is the "actuarial equivalent" of the SLA that the participant earned.  *See* Plan Document at § 1.01(d).

40.     The Traditional Plan's the "normal form of payment" is a 12YCLA for unmarried participants and a 50% joint and survivor annuity for married participants.  *See* Plan Document at Appendix A, § 5.02-A.  The Plan Document provides that the 50% JSA shall be the "actuarial equivalent" of the participant's "accrued benefit," *i.e.*, the 12YCLA.  *See* Plan Document at Appendix A, § 5.02-A.

41.     Participants can receive the benefits under the Traditional Part in several forms, including joint and survivor annuities in percentages of 60, 70, 75, 80, 90 and 100%, first-to-die annuities in 10% increments, life and certain annuities of 5, 10, 12, 15 and 20 years.  *See* Plan Document at Appendix A, § 5.05-A.  The Plan Document says that each of these forms of benefits is the "actuarial equivalent" of the participant's "accrued benefit," *i.e.*, the 12YCLA.

42.     The Traditional Part defines the term "actuarial equivalent" as a benefit determined using the 1971 GAM Table set back 1 year for participants and 5 years for beneficiaries and a 6% interest rate.  *See* Plan Document at § 1.02(a).

43.     Certain participants in the Traditional Part can also receive their retirement benefits as a lump sum if its value is between $5,000 and $15,000.  *See* Plan Document at Appendix A, § 5.5.  To calculate the value of the lump sum benefit, Metropolitan converts the participant's "normal retirement benefit," *i.e.*, the SLA, into a 12YCLA using the Plan's definition of "actuarial equivalence."   Metropolitan then converts the 12YCLA into a lump sum using the Treasury Assumptions.  *See* Plan Document at Appendix A, § 5.05-A(e) and Plan Document at § 1.02(b) (titled, "Special Rules for Converting To Lump Sums").

44.     Accordingly, other than the SLA, Metropolitan calculates all forms of benefit under the Traditional Part using the 1971 GAM table (with setbacks) and a 6% interest rate.  Plaintiffs received benefits under this formula.

## C.     The GenAm Part

45.     The Plan's GenAm Part was the pension plan for employees of GenAmerica Corporation.  In 1999, Metropolitan bought GenAm Corporation and, effective December 31, 2002, the GenAm Part merged into the Plan.  *See* Plan Document at § 1.25.  Effective January 1, 2003, active participants in the GenAm Part, *i.e.*, those who still worked for Metropolitan, could choose whether to continue to accrue benefits under the GenAm Part's formula or to accrue benefits under the Cash Balance Part.

46.     Under the GenAm Part, participants earn a retirement benefit in the form of an SLA based on a percentage of their final average pay multiplied by their years of service.  *See* SPD at 22-24; *see also* Plan Document at Appendix B, § 5.1-B.

47.     The GenAm Part defines the term "normal form" of payment as a 5-year life and certain annuity (a "5YCLA") for unmarried participants and a 50% joint and survivor annuity for married participants.  *See* Plan Document at Appendix B, § 1.18.  The Plan Document says that the 5YCLA and the 50% JSA are both the "actuarial equivalent" of the SLA that the participant earned under the GenAm Plan.  *Id*.

48.     Like the Traditional Part, participants can receive their GenAm Part benefits in several forms, including survivor annuities in percentages of 60, 70, 75, 80, 90 and 100%, first-to-die annuities in 10% increments, and life and certain annuities of 5, 10, 15 and 20 years.  *See* Plan Document at Appendix B, § 9.2-B.  The Plan Document says that each of these forms of benefit are the "actuarial equivalent" of the participant's "normal form" of benefit, *i.e.*, the 5YCLA.

49.      Like the Traditional Part, the GenAm Part defines "actuarial equivalence" as a benefit calculated using the 1971 GAM Table set back 1 year for participants and 5 years for beneficiaries and a 6% interest rate.  *See* Plan Document at § 1.02(a); *see also* Plan Document at Appendix B, § 9.2-B.

50.     Accordingly, other than the SLA, Metropolitan calculates all forms of benefit under the GenAm Part using the 1971 GAM table (with setbacks) and a 6% interest rate.

**D.     The NEF Part**

51.     The Plan's NEF Part was formerly the pension plan for employees of New England Financial.  In 1995, Metropolitan purchased New England Financial and the NEF Part was merged into the Plan on December 31, 2000.  *See* SPD at 17.  Upon the merger, active participants in the NEF Part, *i.e.,* those who still worked for Metropolitan, began accruing benefits under the Traditional Plan formula.

13

52.     Under the NEF Part, participants earn a retirement benefit in the form of an SLA. The SLA is a percentage of their final average pay multiplied by their years of service.  *See* Plan Document at Appendix C, § 3.01-C.

53.     The SLA is NEF Plan's "normal form annuity" and the default form of benefits for unmarried participants.  *See* Plan Document at Appendix C, §§ 1.29-C and 3.01-C.  The default form of benefits for married participants is a 50% JSA, which the Plan Document says will be "the Actuarial Equivalent of [SLA]" due under the terms of the NEF Part.  *See* Plan Document at Appendix C, at § 1.42-C.

54.     Participants in the Plan's NEF Part can receive their benefits in several forms that are the "actuarial equivalent" of the SLA, including joint and survivor annuities in 10% increments and certain and continuous annuities for periods of 5, 10 or 20 years.  *See* Plan Document at Appendix C, § 4.08-C.

55.     The NEF Plan defines "actuarial equivalent" as a benefit having the "same present value when computed using unisex mortality based on the 1983 Group Annuity Table for males, with one (1) year age set-back, without projection, and interest of five percent (5%)."  *See* Plan Document at Appendix C, § 1.02-C.

56.     Accordingly, other than the SLA, Metropolitan calculates all forms of benefit under the NEF Part using the 1983 GAM table (with setbacks) and a 5% interest rate.  Plaintiff McAlister received benefits under this formula.

### E.     The Cash Balance Part

57.     In 2002, the Plan transitioned the Traditional Part's final average pay formula to a cash balance formula in the Cash Balance Part.  Under the Cash Balance Part, Metropolitan contributes a percentage of a participant's compensation to personal retirement account ("PRA"),

which accumulate interest at a rate based on 30-year Treasury securities rate in November of the previous year.  *See* SPD at 7-8.

58.      All Plan participants hired in 2002 or later accrued benefits under the Cash Balance Part.  *See* SPD at 3.  Plan participants who were "active" in 2003, *i.e.*, employed by Metropolitan, had the option of continuing to accrue benefits under the Traditional Part, GenAm Part or NEF Part or to begin accruing benefits under the Cash Balance Party effective January 1, 2003.  *See* SPD at 3.  Active participants who chose to participate in the Cash Balance Part maintained the benefits they accrued under the Traditional Part, GenAm Part and/or NEF Part.  *See* SPD at 22.

59.      While participants have PRAs that have a certain hypothetical value, *e.g.*, $100,000, the "accrued benefit" under the Cash Balance Part is a 5YCLA which is the "actuarial equivalent" of the participant's PRA.  *See* Plan Document at § 1.01.  To convert the PRA to a 5YCLA, Defendants used the 1994 GAM mortality table projected to 2002 with Scale AA, blended 50% male/50% female and the rate for 30-year Treasury securities in November of the previous year until 2014.  *See* Plan Document at § 1.02(c)(1).  In 2015, pursuant to a Plan amendment, Metropolitan began using the Treasury Assumptions to calculate the 5YCLA under the Cash Balance Part.  *See* Plan Document at Amendment 3.

60.      Under the Cash Balance Part, the "normal form of payment" is a 5YCLA for unmarried participants and a 50% JSA for married participants.  *See* Plan Document at § 3.02. Participants can also receive their benefits in other forms, including joint and survivor annuities in 10% increments, first-to-die annuities, or certain and continuous annuities with 5, 10, 12, 15 or 20-year terms.  *See* Plan Document at § 5.05(e).

61.      Metropolitan calculates the various forms of survivor annuities, first-to-die annuities and certain and continuous annuities (other than the 5YCLA) in two steps.  First, it

converts the PRA to a 5YCLA using the Treasury Assumptions.  Second, it converts the 5YCLA to one of the other forms using the 1971 GAM Table with setbacks and a 6% interest rate.  *See* Plan Document at §§ 5.05, 1.02(a).

62.     Accordingly, other than the 5YCLA, Metropolitan calculates all forms of benefit under the Cash Balance Part using the 1971 GAM table (with setbacks) and a 6% interest rate.

## II.     The Plan's Non-SLA Benefits Are Not Actuarially Equivalent to the SLAs Participants Earned.

### A.     Converting an SLA to a Non-SLA.

63.     As set forth above, ERISA requires that a QJSA, a QPSA and QOSAs be the "actuarial equivalent" to an SLA.  *See* ERISA §§ 205(d)(1) and (2), 29 U.S.C. § 1055(d)(1) and (2).  If a participant's "accrued benefit" in a defined benefit plan is expressed in a form other than an SLA, ERISA requires that the alternative form "shall be the actuarial equivalent" of an SLA. *See* ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3).

64.     To convert an SLA into another form, the present value of the ***aggregate*** (*i.e.,* total) future benefits that the participant (and, if applicable, the beneficiary) is expected to receive under both the SLA and the other form must be determined.  The present values are then compared to determine the conversion factor.[5]  There are two main components of these present value calculations: an interest rate and a mortality table.

65.     An interest rate is used to determine the present value of each future payment.  This is based on the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability to earn investment returns.  The rate that is used is often called a "discount rate" because it discounts the value of a future payment.

---

[5] The conversion factor is easily calculated by a computer model.  Defendants simply input the assumptions and the model instantaneously calculates the conversion factor.

66.    As discussed above, the interest rate used by a defined benefit plan to calculate present value must be reasonable based on prevailing market conditions which "reflect anticipated events." *See* 29 U.S.C. § 1002(27).  The interest rate may be broken into segments of short-term, medium-term and long-term expectations pertaining to each future payment. *See, e.g.*, ERISA §§ 205(g)(3)(B)(iii) and 303(h)(2), 29 U.S.C. §§ 1055(g)(3)(B)(iii) and 1083(h)(2).

67.    A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

68.    More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth. The Society of Actuaries ("SOA"), an independent actuarial group, publishes the mortality tables that are the most widely-used by defined benefit plans when doing these conversions. The SOA published mortality tables in 1971 (the "1971 GAM"), 1983, 1984 (the "UP 1984"), 1994 (the "1994 GAR"), 2000 (the "RP-2000") and 2014 ("RP-2014") to account for changes to a population's mortality experience.

69.    Since at least the 1980s, the life expectancies in mortality tables have steadily improved as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1.  According to this paper, there have been "increasing life expectancies over time" and just moving from the 2000 mortality table to the 2014 table would increase pension liabilities by 7%.

70.     Pursuant to Actuarial Standard of Practice 27, para. 3.5.3 of the Actuarial Standards Board,[6] actuarial tables must be adjusted on an ongoing basis to reflect improvements in mortality.[7]

71.     Accordingly, in the years between the publication of a new mortality table, mortality rates are "projected" to future years to account for expected improvements in mortality. For example, in 2017, the Treasury Mortality Table was the RP-2000 mortality table adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected improvements in mortality. IRS Notice 2016-50.[8]  In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014. IRS Notice 2017-60.[9] (the "2018 Treasury Mortality Table").

72.     For purposes of the present value analysis under ERISA, the mortality table must be updated and reasonable "to reflect anticipated events." 29 USC § 1002 (27).

73.     The Treasury Mortality Tables are updated and reasonable. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv).

---

[6] Courts look to professional actuarial standards as part of this analysis. See, e.g. *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (citing Jeff L. Schwartzmann & Ralph Garfield, Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1–24–91 (1991)).

[7] *See* http://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/#353-mortality-and-mortality-improvement.

[8] *See* https://www.irs.gov/pub/irs-drop/n-16-50.pdf.

[9] *See* https://www.irs.gov/pub/irs-drop/n-17-60.pdf.

74.     Using a reasonable interest rate and mortality table, the present value of the SLA and an alternative form of benefit can be compared to determine whether they are actuarially equivalent.

75.     Changes to interest rates or mortality assumptions can have dramatic effects on the conversion factor and the value of an alternative form of benefit.  When a high interest rate is used, the amount of the monthly benefit under a joint and survivor annuity increases.  Conversely, using an antiquated mortality table generates lower present values of future payments, and the amount of the monthly benefit under a joint and survivor annuity decreases.

76.     Plans must use reasonable interest rates and mortality tables to evaluate whether the present values of benefit options produce equivalent benefits for participants and beneficiaries.

**B.      The Plan Does Not Use Reasonable Actuarial Factors to Calculate Several Forms of Benefits, Reducing Participants' Benefits in Violation of ERISA.**

77.     Throughout the Class Period, Metropolitan used a 6% interest rate and the 1971 GAM table, set back one year for Participants or Former Participants and set back five years for other beneficiaries, to calculate the following forms of benefits under the Plan, which Plaintiffs collectively call the "1971 GAM Based Benefits:"

a.      **In the Traditional Part**: the joint and survivor annuities (including the 50% JSA that is the default for married participants), the first-to-die annuities, the certain and life annuities (including the 12YCLA that is the default for unmarried participants) and the lump sum benefit.

b.      **In the GenAm Part**: the joint and survivor annuities (including the 50% JSA that is the default for married participants), the first-to-die annuities, the certain and life annuities (including the 5YCLA that is the default for unmarried participants).

      c.     **In the Cash Balance Part**: the joint and survivor annuities (including the 50% JSA that is the default for married participants), first-to-die annuities, and the certain and continuous annuities for 10, 12, 15 and 20-year terms.

78.    Throughout the Class Period, Defendants used a 5% interest rate and the 1983 GAM table, set back one year, without projection, to calculate the following forms of benefits under the NEF Part: joint and survivor annuities (including the 50% JSA that is the default for married participants) and certain and life annuities (collectively, the "1983 GAM Based Benefits").

79.    Defendants' use of the 1971 GAM table to calculate the actuarially equivalent value of the 1971 GAM Based Benefits is unreasonable because the 1971 GAM table is severely outdated and does not "reflect anticipated events" (i.e. the anticipated mortality rates of participants).

80.    The 1971 GAM table is nearly ***50 years*** out of date, and as such, it overstates mortality rates. According to the Centers for Disease Control and Prevention, in 1970, a 65-year-old had an average life expectancy of 15.2 years.[10] In 2010, a 65-year-old had a 19.1-year life expectancy, a 26% increase. Accordingly, by 2010, the average employee would have expected to receive, and the average employer would have expected to pay, benefits for a substantially longer period of time than in 1971.

81.    Defendants' use of the 1983 GAM table to calculate the 1983 GAM Based Benefits was similarly unreasonable because the 1983 GAM table is outdated and overstates mortality rates compared to current actuarial tables.

---

[10] *See* https://www.cdc.gov/nchs/data/hus/2011/022.pdf.

82.     Additionally, the setbacks the Plan uses do not correct the impact of the 1971 GAM table and the 1983 GAM table's outdated mortality assumptions.

83.     Using the 1971 GAM table and the 1983 GAM table decreases the value of the 1971 GAM Based Benefits and the 1983 GAM Based Benefits, respectively, thereby materially reducing the monthly benefits that Participants and beneficiaries receive in comparison to the monthly benefits Participants and beneficiaries would receive if the Plan used updated, reasonable mortality assumptions.

84.     Defendants knew or should have known that the 1971 GAM table and the 1983 GAM table were outdated and unreasonable and that using them produced lower monthly benefits for participants and beneficiaries receiving any of the alternative forms of benefit that were calculated with these outdated mortality tables.

85.     Importantly, MetLife, Inc., the holding company that owns Metropolitan and its affiliates, uses up-to-date actuarial assumptions when calculating pension plan costs in its audited financial statements that it prepares with the assistance of an independent auditor.  Under Generally Accepted Accounting Principles, mortality assumptions "should represent the 'best estimate' for that assumption as of the current measurement date."[11] In its Annual Report to Shareholders filed with the SEC on Form 10-k, in calculating pension plan costs, MetLife represents as follows:

---

[11] Many entities rely on their actuarial firms for advice or recommendations related to demographic assumptions, such as the mortality assumption. Frequently, actuaries recommend published tables that reflect broad-based studies of mortality. Under ASC 715-30 and ASC 715-60, each assumption should represent the "best estimate" for that assumption as of the current measurement date. The mortality tables used and adjustments made (e.g., for longevity improvements) should be appropriate for the employee base covered under the plan. Last year, the Retirement Plans Experience Committee of the Society of Actuaries (SOA) released a new set of mortality tables (RP-2014) and a new companion mortality improvement scale (MP-2014). Further, on October 8, 2015, the SOA released an updated mortality improvement scale, MP-2015, which shows a decline in the recently observed longevity improvements. Although entities are not required to use SOA

> ***Changes in Our Assumptions Regarding the Discount Rate, Expected Rate of Return, Mortality Rates and Expected Increase in Compensation Used for Our Pension and Other Postretirement Benefit Plans May Result in Increased Expenses and Reduce Our Profitability*** (emphasis in original).

We determine our pension and other postretirement benefit plan costs ***based on our best estimates of future plan experience***. ***These assumptions are reviewed regularly*** and include discount rates, expected rates of return on plan assets, ***mortality rates***, expected increases in compensation levels and expected medical inflation. Changes in these assumptions may result in increased expenses and reduce our profitability. See Note 17 of the Notes to the Consolidated Financial Statements for details on how changes in these assumptions would affect plan costs. (Emphasis added.)[12]

86.     MetLife, Inc. used updated mortality tables in its financial statements throughout the Class Period.  In the audited financial statements, MetLife, Inc. used reasonable actuarial assumptions to report a greater liability for benefits than they were paying out using the unreasonable 1971 GAM table and the unreasonable 1983 GAM table.  There is no reasonable justification for Defendants to use an old mortality table that presumes an early death and an early end to benefit payments in order to calculate an unfairly low annual benefit for participants, while at the same time using a reasonable mortality table to project a longer duration of these very same annual benefit payments for annual financial reporting. Since these two analyses measure the

---

mortality tables, the SOA is a leading provider of actuarial research, and its mortality tables and mortality improvement scales are widely used by plan sponsors as a starting point for developing their mortality assumptions. Accordingly, it is advisable for entities, with the help of their actuaries, to (1) continue monitoring the availability of updates to mortality tables and experience studies and (2) consider whether these updates should be incorporated in the current-year mortality assumption." *See*, Deloitte, Financial Reporting Considerations Related to Pension and Other Postretirement Benefits, Financial Reporting Alert 15-4, October 30, 2015 at 3. https://www2.deloitte.com/content/dam/Deloitte/us/Documents/audit/ASC/FRA/2015/us-aers-fra-financial-reporting-considerations-related-to-pension-and-other-postretirement-benefits-103015.pdf

[12] *See* https://investor.metlife.com/static-files/9ec0e335-c838-47f1-b211-2748efad14a4, at 77.

length of the very same lives and the very same benefit streams, they should use the same mortality assumptions. "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit; rather we stated, 'If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence.'" *Laurent v. Price WaterhouseCoopers LLP*, 794 F.3d 272 (2d Cir. 2015) *quoting*, *Edsen v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000).

87.    Defendants likewise use the reasonable Treasury Mortality Table when they convert a retiree's retirement account cash balance under the Cash Balance Part into a 5YCLA:

> The [cash] balance shall be converted to an ***actuarial equivalent*** of a 5 Year Certain and Life Annuity at retirement using the 30-Year Treasury Rate for the preceding November and ***the applicable mortality table (as defined in IRC § 417(e))***.

2017 Form 5500, Schedule SB, Part V (emphasis added); *see also* Plan Document at Amendment 3 (changing interest rate to the segment rates in I.R.C. § 417(e)).

88.    Although Defendants use reasonable mortality tables when calculating actuarial present values for their obligations to shareholders, they knowingly and wrongfully use the 1971 GAM table, a mortality table nearly 50 years our-of-date, and the 1983 GAM table, a table that is 35 years out-of-date, to calculate the 1971 GAM Based Benefits and the 1983 Based Benefits, respectively.[13]

89.    Defendants knowingly misrepresented to Participants that 1971 GAM Based Benefits and the 1983 GAM Based Benefits were actuarially equivalent to the benefits they earned under the Plan to reduce the amount of benefits they were obligated to pay.

---

[13] It appears that Defendants have not updated the mortality table used to calculate benefits since the Plan was implemented on January 1, 1976.

90.     During the Class Period, Metropolitan's use of the 1971 GAM table to calculate 1971 GAM Based Benefits was unreasonable.

91.     Likewise, during the Class Period, Metropolitan's use of the 1983 GAM table to calculate 1983 GAM Based Benefits was unreasonable.

92.     Had the Plan used reasonable actuarial assumptions, such as the Treasury Assumptions, Plaintiffs and the Class would have received, and would continue to receive, actuarially equivalent benefits that are greater than the benefits they currently receive.

93.     Under the Treasury Assumptions, the conversion factor for a 65-year-old participant with a 65-year-old spouse selecting a 100% joint and survivor annuity in 2018 would have been 86.3% with a four-month lookback (as is typical). Under the Plan's assumptions, however, the conversion factor would have been only 78.8%, 8.7% less.

94.     Plaintiff McAlister, who retired at age 63 when her husband was 67, accrued an SLA under the Traditional Part of $663 per month. She selected a 100% joint and survivor annuity (a 1971 GAM Based Benefit) which pays $576 per month. Given Plaintiff McAlister and her husband's life expectancies and the form of benefit (a 100% joint and survivor annuity), Metropolitan's use of the 1971 GAM Factors instead of the applicable Treasury Assumptions reduced the present value of Plaintiff's McAlister's benefits under the Traditional Part by $4,190..

95.     Under the Plan's NEF Part, Plaintiff McAlister accrued an SLA of $677 per month. She selected a 100% joint and survivor annuity, a 1983 GAM Based Benefit, which pays $593 per month. Given Plaintiff McAlister and her husband's life expectancies and the form of benefit (a 100% joint and survivor annuity), Metropolitan's use of the 1983 GAM Factors instead of the applicable Treasury Assumptions reduced the present value of Plaintiff's McAlister's benefits under the NEF Part by $3,269.

96.     Plaintiff Masten, who retired at age 55 when his wife was 53, accrued an SLA, the normal form of benefit, in the amount of $2,310 under the Traditional Plan.  Masten selected a 30% First-to-Die Annuity which pays $2,327 per month until the earlier of his or his wife's death, and then $698 per month thereafter.  Given Plaintiff Masten and his wife's life expectancies and the form of benefit (a 30% first-to-die annuity), Metropolitan's use of the 1971 GAM Factors instead of the applicable Treasury Assumptions reduced the present value of Plaintiff's Masten's benefits under the Traditional Part by $7,385.51.

97.     According to the Plan's Form 5500, the actuarial present value of the accumulated Plan benefits was over $7 billion.  Discovery will likely show that Defendants' use of unreasonable actuarial assumptions deprives retirees and their spouses out of tens of millions of dollars.

98.     Because the Plan used grossly outdated, unreasonable mortality tables throughout the Class Period, the benefits paid to Participants and beneficiaries who receive 1971 GAM Based Benefits and 1983 GAM Based Benefits are ***not*** actuarially equivalent to the SLAs they accrued in violation of ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), ERISA § 205(d)(1)(B), 29 U.S.C. § 1055(d)(1)(B) and ERISA § 205(d)(2)(A), 29 U.S.C. § 1055(d)(2)(A).  Rather, the benefits payable under these forms are much lower than they should be.

99.     Plaintiffs are Participants of the Plan who are receiving a 1971 GAM Based Benefit and Plaintiff McAlister is also receiving a 1983 GAM Based Benefit.  Because their benefits were calculated using outdated, unreasonable mortality tables, Plaintiffs have been harmed because they are receiving less each month than they would if the Plan used current, reasonable actuarial assumptions.  They, along with other class members, have been substantially damaged as a result of receiving benefits below an actuarially equivalent amount.

## CLASS ACTION ALLEGATIONS

100.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the class (the "Class") defined as follows:

> All participants in and beneficiaries of the Plan who elected to receive a benefit calculated using: (1) the 1971 GAM table (with setbacks) and a 6% interest rate; or (2) the 1983 GAM table (with setbacks) and a 5% interest rate.  Excluded from the Class are Defendants and any individuals who are subsequently to be determined to be fiduciaries of the Plan.

101.    The members of the Class are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes thousands of persons. Metropolitan employs nearly 50,000 individuals and the Plan in question covers all U.S. salaried or commissioned employees who have completed a year of service. *See* Form 5500, Schedule SB, Part V.

102.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims and the claims of all Class members arise out of the same policies and practices as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

103.    There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.      Whether the Plan's formulae for calculating 1971 GAM Based Benefits and 1983 GAM Based Benefits provide benefits that are actuarially equivalent to the single life annuities;

B.      Whether the Plan's actuarial assumptions are reasonable;

C.      Whether the Plan should be reformed to comply with ERISA; and

       D.     Whether Plaintiffs and Class members should receive additional benefits.

104.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class actions.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

105.    This action may be properly certified under either subsection of Rule 23(b)(1). Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

106.    In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

107.    In the alternative, certification under Rule 23(b)(3) is warranted because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**FIRST CLAIM FOR RELIEF**
**Declaratory and Equitable Relief**
**(ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))**

108.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

109.    The Plan improperly reduces annuity benefits for participants and beneficiaries who receive 1971 GAM Based Benefits or 1983 GAM Based Benefits below the benefits that they would receive if those benefits were actuarially equivalent to a single life annuity as ERISA requires.

110.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

111.    Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the Plan's established methodologies for calculating actuarial equivalence of 1971 GAM Based Benefits and 1983 GAM Based Benefits, including the joint and survivor annuity, single life annuity, and "certain and life" options, violate ERISA because they do not provide an actuarially equivalent benefit.  By not providing an actuarially equivalent benefit, Defendants have violated ERISA's anti-forfeiture clause, ERISA § 203(a), 29 U.S.C. § 1053(a).

112.    Plaintiffs further seek orders from the Court providing a full range of equitable relief, including but not limited to:

    (a)    re-calculation, correction and payment of benefits previously paid for 1971 GAM Based Benefits and 1983 GAM Based Benefits;

(b)     an "accounting" of all prior benefits and payments;

(c)     a surcharge;

(d)     disgorgement of amounts wrongfully withheld;

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

### SECOND CLAIM FOR RELIEF
### For Reformation of the Plan and Recovery of Benefits Under the Reformed Plan
### (ERISA § 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3))

113.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

114.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

115.    The Plan improperly reduces annuity benefits for participants who receive 1971 GAM Based Benefits and 1983 GAM Based Benefits below the benefits that they would receive if those benefits were actuarially equivalent to a single life annuity as ERISA requires. By not providing an actuarially equivalent benefit, Defendants have violated ERISA's anti-forfeiture clause, ERISA § 203(a), 29 U.S.C. § 1053(a).

116.    Plaintiffs are entitled to reformation of the Plan to require Defendants to provide actuarially equivalent benefits.

117.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

118.    Plaintiffs are entitled to recover actuarially equivalent benefits, to enforce their rights to the payment of past and future actuarially equivalent benefits, and to clarify their rights to future actuarially equivalent benefits, under the Plan following reformation.

### THIRD CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### (ERISA §§ 404 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))

119.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

120.    As the Plan's administrator, Metropolitan is a named fiduciary of the Plan.

121.    The Committee is a named fiduciary of the Plan.

122.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is

required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

123.    The Committee and its members are fiduciaries for the Plan because they exercised discretionary authority or control respecting the management of the Plan or exercised management or disposition of Plan assets.  In particular, they had authority or control over the amount and payment of benefits paid through 1971 GAM Based Benefits and 1983 GAM Based Benefits which were paid from Plan assets.

124.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan insofar as the Plan is consistent with ERISA.

125.    The Plan is not consistent with ERISA because it uses: (a) the outdated 1971 GAM table, coupled with a 6% interest rate, to calculate 1971 GAM Based Benefits; and (b) the outdated 1983 GAM table, coupled with a 5% interest rate, to calculate 1983 GAM Based Benefits. As a result, the Plan's calculation of benefits other than these produces results that are not actuarially equivalent resulting in participants and beneficiaries illegally forfeiting and losing vested benefits in violation of ERISA.

126.    In following the Plan, which did not confirm with ERISA, the Committee and its members exercised their fiduciary duties and control over Plan assets in breach of their fiduciary duties.

127.    ERISA imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance with ERISA.  In allowing the Committee to pay benefits that were not actuarially equivalent in violation of ERISA, Metropolitan breached its fiduciary duty to supervise and monitor the Committee.

128.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

129.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the Plan's established methodologies for calculating actuarial equivalence of 1971 GAM Based Benefits and 1983 GAM Based Benefits violate ERISA because they do not provide actuarially equivalent benefits.

130.     Plaintiffs further seek orders from the Court providing a full range of equitable relief, including but not limited to:

(a)     re-calculation, correction, and payments of benefits actuarially equivalent 1971 GAM Based Benefits and 1983 GAM Based Benefits;

(b)     an "accounting" of all prior benefits and payments;

(c)     a surcharge;

(d)     disgorgement of amounts wrongfully withheld;

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.      Certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Declaring that the Plan fails to properly calculate and pay 1971 GAM Based Benefits and 1983 GAM Based Benefits that are actuarially equivalent to the single life annuities, in violation of ERISA;

C.      Ordering Defendants to bring the Plan into compliance with ERISA, including, but not limited to, reforming the Plan to bring it into compliance with ERISA with respect to calculation of actuarially equivalent 1971 GAM Based Benefits and 1983 GAM Based Benefits;

D.      Ordering Defendants to correct and recalculate benefits that have been paid;

E.      Ordering Defendants to provide an "accounting" of all prior payments of benefits under the Plan to determine the proper amounts that should have been paid;

F.      Ordering Defendants to pay all benefits improperly withheld, including under the theories of surcharge and disgorgement;

G.      Ordering Defendants to disgorge any profits earned on amounts improperly withheld;

H.      Imposition of a constructive trust;

I.      Imposition of an equitable lien;

J.      Reformation of the Plan;

K.      Ordering Defendants to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

L.      Ordering Defendants to pay future benefits in accordance with the terms of the Plan, as reformed.

M.      Awarding, declaring, or otherwise providing Plaintiffs and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper;

N.      Awarding attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

O.      Any other relief the Court determines is just and proper.


Dated: March 21, 2019                             Respectfully submitted,


                                                   *s/ Robert A. Izard*
                                                   **IZARD, KINDALL & RAABE LLP**
                                                   Robert A. Izard (admitted *pro hac vice*)
                                                   Seth R. Klein (admitted *pro hac vice*)
                                                   Douglas P. Needham
                                                   29 South Main Street, Suite 305
                                                   West Hartford, CT 06107
                                                   Tel: (860) 493-6292
                                                   Fax: (860) 493-6290
                                                   Email:  rizard@ikrlaw.com
                                                   Email:  sklein@ikrlaw.com
                                                   Email:  dneedham@ikrlaw.com


                                                   **BAILEY & GLASSER LLP**
                                                   Gregory Y. Porter (admitted *pro hac vice*)
                                                   Mark G. Boyko
                                                   1054 31st Street, NW, Suite 230
                                                   Washington, DC 20007
                                                   (202) 463-2101
                                                   (202) 463-2103 fax
                                                   gporter@baileyglasser.com
                                                   mboyko@baileyglasser.com

                                                   ***Counsel for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 21, 2019, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.


*/s/ Robert A. Izard*
Robert A. Izard