UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC-SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC#:                            │
│ DATE FILED: 6/14/2021            │
└─────────────────────────────────┘
```

WILLIAM MASTEN AND CATHERINE
MCALISTER, *on behalf of themselves and all
others similarly situated,*

                                        Plaintiffs,

                        v.

METROPOLITAN LIFE INSURANCE
COMPANY, THE METROPOLITAN LIFE
INSURANCE COMPANY EMPLOYEE
BENEFITS COMMITTEE, AND
JOHN/JANE DOES 1-20,

                                        Defendants.

No.  18-CV-11229 (RA)

OPINION AND
ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiffs William Masten and Catherine McAlister bring this putative class action against Defendants Metropolitan Life Insurance Company, the Metropolitan Life Insurance Company Employee Benefits Committee, and the individual members of the Committee, alleging that their retirement plan's use of outdated mortality tables to calculate alternative benefits violates the requirements of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA" or the "Act").  Now before the Court is Defendants' motion to dismiss the complaint.  For the reasons that follow, that motion is granted in part and denied in part.

# BACKGROUND

Plaintiffs William Masten and Catherine McAlister, retirees of Defendant Metropolitan Life Insurance Company ("MetLife") and its affiliates, are participants in the Metropolitan Life Retirement Plan (the "Plan").  They claim that the Plan's use of mortality tables from 1971 and 1983 to convert default retirement benefits into the alternative benefits that they opted to receive constitute unreasonable actuarial assumptions, in violation of the statutory requirement that alternative benefits be "actuarially equivalent."  Before discussing the factual background that bears on the legality of the alternative benefits offered by the Plan, the Court reviews the statutory framework in which the issue arises.

## I.     ERISA Statutory Scheme

Congress has proclaimed that the "policy" of ERISA is to protect "the interests of participants in employee benefit plans and their beneficiaries, … by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts."  29 U.S.C. § 1001(b).  Put differently, ERISA was "enacted to restrict employers' and employees' freedom of contract when bargaining over pensions."  *Esden v. Bank of Bos.*, 229 F.3d 154, 172 (2d Cir. 2000).  As relevant here, employee benefit plans must meet ERISA's non-forfeitability requirements, which are "minimum vesting standards mandating that '[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age.'"  *Laurent v. PricewaterhouseCoopers LLP*, 794 F.3d 272, 274 (2d Cir. 2015) (quoting 29 U.S.C. § 1053(a)).  A defined-benefit plan satisfies these requirements if "an employee who has completed at least 5 years of service has a nonforfeitable right to 100 percent of the employee's accrued benefit derived from employer contributions."  29 U.S.C. § 1053(a)(2)(A)(ii).  ERISA defines "accrued

benefit" as "the individual's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age." *Id*. § 1002(23)(A); *see Laurent*, 794 F.3d at 274 ("In plain English, this means that an employee's accrued benefit is the amount she would receive annually as an annuity after she reaches normal retirement age.").

ERISA further requires that defined-benefit plans provide "a qualified joint and survivor annuity" and a "qualified optional survivor annuity" to qualified participants and beneficiaries. *Id*. § 1055(d)(1). Both forms of alternative benefits must be "the actuarial equivalent of a single annuity for the life of the participant." *Id*. §§ 1055(d)(1)(B), 1055(d)(2)(A)(ii). In a single life annuity (or "SLA"), a pensioner receives a defined-benefit payment for the duration of her own life. *See, e.g., Spirt v. Teachers. Ins. & Annuity Ass'n*, 691 F.2d 1054, 1058 n.1 (2d Cir. 1982). The Act does not define "actuarial equivalent." Implementing regulations promulgated by the United States Department of Treasury ("Treasury") direct employers to use "reasonable actuarial factors" to determine the actuarial equivalence of qualified joint and survivor annuities. *See* 26 C.F.R. § 1.401(a)-11(b)(2) ("A qualified joint and survivor annuity must be at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan. Equivalence may be determined, on the basis of consistently applied reasonable actuarial factors, for each participant or for all participants or reasonable groupings of participants…").

ERISA authorizes private rights of action brought by participants or beneficiaries to "(A) enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

## II.      Factual Background[1]

The Plan, which Plaintiffs allege qualifies as a defined-benefit plan within the meaning of the Act, "has several formulae for how participants earn retirement benefits."  Dkt. 42, Corrected Amended Complaint, ("Complaint") ¶¶ 2, 35.  Under the Plan's traditional formula, participants earn a retirement benefit in the form of an SLA based on their final average compensation and years of service.  *Id.*  The Plan also offers alternative benefit forms, "including 'certain and life annuities' which provide … benefits for at least a specified minimum period, *e.g.* 5 years, regardless of how long the participant lives; first-to-die annuities; and 'joint and survivor annuities' … (collectively, 'Non-SLA Annuities')."  *Id.* ¶ 2.  With respect to these Non-SLA Annuities, the Plan applies actuarial assumptions based on a set of mortality tables and interest rates to calculate a benefit amount that purports to be actuarially equivalent to the accrued SLA benefit.  *Id.* ¶ 3.  In other words, the conversion factor, according to which an SLA is converted into another form, has two main components: an interest rate and a mortality table, which is "a series of rates which predict how many people at a given age will die before attaining the next higher age."  *Id.* ¶¶ 64, 67.

Until 2003, Plan participants earned benefits under the "Traditional Part," according to which the retirement benefit was calculated as "percentage of their compensation multiplied by how many years they worked for [MetLife]."  *Id.* ¶ 37.  Masten accrued a benefit under the Traditional Part but he and his wife receive "a joint and survivor retirement annuity."  *Id.* ¶ 13.  Elsewhere, the Compliant asserts that Masten selected a "30% First-to-Die Annuity," which pays $2,327 per month until the earlier of his or his wife's death, and then $698 per month thereafter.  *Id.* ¶ 96.  Plaintiffs allege that the "Traditional Part's 'normal retirement benefit' is an SLA."  *Id.* ¶ 38.  The Traditional Part defines

---

[1] The following facts are drawn from the Corrected Amended Complaint, Dkt. 42, and assumed to be true for the purposes of this motion.  *See, e.g., Dane v. UnitedHealthcare Ins. Co.,* 974 F.3d 183, 188 (2d Cir. 2020).  The Court also considers facts drawn from the retirement plan at issue, which is incorporated by reference into the Complaint.  *See id.* at 187 n.1.

the term "accrued benefit" as a 12-year life and certain annuity (a "12YCLA"), a benefit that the Plan provides is the "actuarial equivalent" of the SLA that the participant earned. *Id.* ¶ 39.  According to the Plan Document, each of the alternative forms of benefit available to participants is the actuarial equivalent of the participant's accrued benefit, *i.e.*, the 12YCLA. *Id.* ¶ 41.  For the Traditional Part, Defendants calculate the value of the Non-SLA Annuities "using the 1971 Group Annuity Mortality Table for Males (the '1971 GAM Table'), set back one year for participants and set back five years for beneficiaries and a 6% interest rate." *Id.* ¶ 6.

The Plan's "NEF" Part—formerly the pension plan for employees of New England Financial—was merged into the Plan in December 31, 2000 following MetLife's purchase of that entity. *Id.* ¶ 51.  McAlister and her husband receive "separate joint and survivor retirement annuities under the Traditional Part and the NEF Part." *Id.* ¶ 14.  Under the NEF Part, participants earn a retirement benefit in the form of an SLA. *Id.* ¶ 52.  "For the NEF Part, Defendants use the 1983 Group Annuity Table ('1983 GAM Table') for males set-back one year and a 5% interest rate" to calculate the conversion factor from SLA to Non-SLA Annuities. *Id.* ¶ 6.

Plaintiffs allege that "the holding company that owns [MetLife] and its affiliates[] uses up-to-date actuarial assumptions when calculating pension plan costs in its audited financial statements that it prepares with the assistance of an independent auditor," in accordance with the generally accepted accounting principle that mortality assumptions represent "the 'best estimate' for the assumption as of the current measurement date." *Id.* ¶ 85.  For example, the Society of Actuaries published a mortality table in 2014 to "account for changes to a population's mortality experience." *Id.* ¶ 68.  As of 2018, Treasury has used that 2014 mortality table. *Id.* ¶ 71.

III.    **Class Action Allegations**

Plaintiffs bring this action on behalf of themselves and a class that they define as: "All participants in and beneficiaries of the Plan who elected to receive a benefit calculated using: (1) the 1971 GAM table (with setbacks) and a 6% interest rate; or (2) the 1983 GAM table (with setbacks) and a 5% interest rate." *Id.* ¶ 100.  They do not define a class period.

Plaintiffs claim that Defendants' use of these mortality tables to calculate the amount of Non-SLA Annuities decreases their present value in violation of ERISA's requirement that such alternative benefits be "actuarially equivalent" to the Plan's SLA.  *See id.* ¶¶ 103, 109.  Essentially, Plaintiffs maintain that the use of "outdated mortality tables" conflicts with the implicit requirement that plans use actuarial assumptions that are reasonable.  *Id.* ¶¶ 84, 90-91.  According to Plaintiffs, the prevailing standards of practice of the Actuarial Standards Board require actuarial tables to "be adjusted on an ongoing basis to reflect improvements in mortality."  *Id.* ¶ 71.  As mortality rates have improved over time, "[o]lder morality tables predict that people will die at a faster rate than current mortality tables." *Id.* ¶ 8.  Defendants' use of updated mortality tables for the purposes of annual financial reporting whilst using "an old mortality table that presumes an early death and an early end to benefit payments in order to calculate an unfairly low annual benefit for participants" demonstrates the unreasonableness of the Plan.  *Id.* ¶ 86.  Plaintiffs maintain "that the setbacks the Plan uses do not correct the impact of the 1971 GAM table and the 1983 GAM table's outdated mortality assumptions."  *Id.* ¶ 82.  They calculate that the use of outdated mortality assumptions reduces the present value of Plaintiff McAlister's benefits by $7,459 and Plaintiff Masten's benefits by $7,385. *Id.* ¶ 8.  Similarly, Plaintiffs claim that "just moving from the 2000 mortality table to the 2014 table would increase pension liabilities by 7%." *Id.* ¶ 69.

Plaintiffs claim that Defendants' failure to provide an actuarially equivalent benefit, *i.e.*, one converted on the basis of reasonable actuarial assumptions, violates the Act's anti-forfeiture clause, ERISA Section 203, 29 U.S.C. § 1053(a).  They seek declaratory and equitable relief including, but not limited to, an account of all prior benefits and payments and disgorgement of amounts wrongfully withheld.  Compl. ¶ 112.  In their second cause of action, Plaintiffs seek reformation of the Plan "to require Defendants to provide actuarially equivalent benefits."  *Id.* ¶ 116.  Plaintiffs maintain that the mortality rates and interest rates set by the Secretary of Treasury based on "current market rates and mortality assumptions" pursuant to 26 U.S.C. §§ 417(e) and 430(h) are examples of "reasonable actuarial assumptions."  *Id.* ¶¶ 27, 92.  Lastly, Plaintiffs allege that MetLife and the Committee breached their duties as fiduciaries of the Plan by administering a plan that was not consistent with the requirements of ERISA.  *Id.* ¶ 119.

## STANDARD OF REVIEW

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In making that determination, the Court must accept as true all well-pled factual allegations and draw from them all reasonable inferences.  *See, e.g., Dane*, 974 F.3d at 188.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 189 (internal quotation marks omitted).  The Court may consider any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any integral document on which the plaintiff relied in drafting the complaint.  *See Nicosia v. Amazon.com, Inc.,* 834 F.3d 220, 230-31 (2d Cir. 2016).

**DISCUSSION**

I.     **Whether the Complaint Plausibly Alleges Injury from the Plan's Mortality Assumptions**

According to Defendants' first argument for dismissal, the Complaint's purported lack of "guidance as to what would constitute a range of reasonable [actuarial] assumptions against which to compare the assumptions used by the Plan," constitutes a failure to plausibly allege that any harm stems from the Plan's mortality assumptions. Mot. at 10-13. Plaintiffs maintain that the Complaint demonstrates injury by comparing their current benefits to the amount they would receive were those benefits converted with updated mortality tables. The Court is not persuaded that the absence of specifications as to "what conversion factors or range of assumptions" would be considered reasonable—or would be necessary for actuarial equivalence—constitutes a "fatal defect" mandating dismissal of the Complaint. *See* Mot. at 2, 10. Such an argument misconstrues the Complaint, which seeks to bring the Plan into compliance with ERISA through the use of updated mortality tables.

Relying primarily on *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 103 (2d Cir. 2005), Defendants maintain that a claim seeking plan reformation under ERISA must provide sufficient context to allow the Court to fashion relief. Mot. at 11. The Court accepts that general proposition. Yet it provides no grounds for dismissal of Plaintiffs' claims. In *Nechis*, the Second Circuit affirmed dismissal of a claim where the Plaintiff had "merely assert[ed] that [the challenged plan]'s resolution and appeals procedure should be reformed" without "alleg[ing] a basis for reformation such as . . . terms violative of ERISA." 421 F.3d at 103. Here, by contrast, Plaintiffs claim that the Plan's use of decades-old mortality tables violates a specific provision of ERISA, namely the Section 205 requirement that covered joint-and-survivor annuities be actuarially equivalent to the SLAs from which they were converted. The Complaint also refers to the more contemporary mortality tables used by the Society of Actuaries, *see* Compl. ¶ 68, and Treasury, *see id.* ¶¶ 27, 71, as examples of

8

available reasonable alternatives.  The Court finds that these allegations provide "sufficient context" of the nature of the relief sought.  Simply put, Plaintiffs seek to reform the Plan by replacing the 1971 and 1983 mortality tables with more current ones.  Requiring Plaintiffs to further specify "what set of assumptions would be reasonable," *see* Mot. at 13, would impose a pleading standard that is more stringent than that required by either ERISA or the Federal Rules of Civil Procedure.

Relatedly, Defendants argue that the Complaint misinterprets the Plan, by "assum[ing] that the normal retirement benefit from which Plaintiffs' alternative benefits are calculated is a single life annuity ... when in fact the Plan clearly provides for a different form of normal retirement benefit." Mot. at 2.  As a result, Defendants insist, "there is no way to tell from the [] Complaint whether the assumptions proposed by Plaintiffs would materially increase their benefits." *Id.*   Indeed, they maintain that "the use of an older mortality assumption actually works to the benefit of many participants," when the conversion is properly assessed against the default benefit.  Reply at 2. Plaintiffs disagree with this interpretation of the Plan, insisting that the mortality tables have reduced their benefit payments.  Opp. at 13 n.13.  On a motion to dismiss,  Plaintiff's factual allegations— including that the use of outdated mortality assumptions has reduced the present value of their benefits by more than $7,000 each, Compl. ¶ 8—must be accepted as true.

Moreover, the Court finds that that this factual dispute is immaterial to Plaintiff's claim under ERISA Section 205.  ERISA requires that any "qualified joint and survivor annuity" and "qualified option survivor annuity" be the "actuarial equivalent of a single annuity for the life of the participant," not the plan's default retirement benefit.  *See* 29 U.S.C. § 1055(d).[2]  Plaintiffs allege, and the Court

---

[2] At oral argument, Defendants for the first time argued that the alternative benefits selected by the named Plaintiffs do not qualify as either a "qualified joint and survivor annuity" or a "qualified option survivor annuity," and that § 1055(d) therefore does not control.  Plaintiffs dispute this characterization of the benefits that they selected.  Drawing all reasonable inferences in favor of Plaintiffs as the non-moving party, the Court finds, for purposes of this motion, that the "joint and survivor retirement annuities," Compl. ¶¶ 13-14, selected by Masten and McAlister fall under the purview of § 1055(d). Of course, discovery as to the precise terms of the benefits that the named Plaintiffs selected upon their retirement may reveal otherwise.

can reasonably infer, that the use of older mortality tables produces a lower benefit payment.  As a result, the allegation that Plaintiffs' joint-and-survivor benefits are not actuarially equivalent to an SLA adequately pleads injury regardless of the Plan's starting point for benefit calculation.

At this stage of proceedings, the Court finds it plausible that the Plan's use of decades-old mortality tables is not a "reasonable" actuarial assumption in light of the ready availability of updated alternatives.  Whether that allegation states a claim for relief under ERISA is a separate question that the Court addresses below.

## II.     Whether Plaintiffs Adequately Plead Violations of ERISA

Defendants next argue that Plaintiffs fail to state a claim under ERISA because "Plaintiffs do not identify any statutory (or other) requirement to use specific actuarial assumptions."  Mot. at 15.  Absent such a requirement, Defendants maintain, the Plan's use of mortality tables from 1971 and 1983 does not violate the Act.  Plaintiffs aver that the allegedly outdated mortality tables violate the Act's actuarial-equivalence and nonforfeiture requirements because they are unreasonable actuarial assumptions.  The Court concludes that these plausible allegations of unreasonableness suffice to state a claim under ERISA Sections 205 and 203.

Plaintiffs claim that that the actuarial assumptions used by the Plan violate the Act's implicit requirement that actuarial assumptions be reasonable.  In other words, they maintain that ERISA's lack of specification as to which types of actuarial assumptions or mortality tables are permissible does not prevent Plaintiffs from bringing suit on that basis.  The Court agrees with that interpretation of ERISA, even though the statute does not expressly impose a reasonableness requirement.

The text of ERISA requires only that covered joint-and-survivor annuities and optional-survivor annuities be "the actuarial equivalent" of a single life annuity.  *See* 29 U.S.C. § 1055(d).  The Act nowhere defines actuarial equivalent.  Nor have courts agreed on a definition.  The Second

Circuit, without supplying any definition of the term, has stated that the actuarial-equivalence requirement limits the discretion enjoyed by plan administrators in selecting actuarial methodology. *See Laurent*, 794 F.3d at 286 ("ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit."); *Esden*, 229 F.3d at 164 ("If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of 'actuarial equivalence.'").  In both instances, the Circuit made clear that this requirement was intended to inure to the benefit of pensioners and beneficiaries.   Because the challenged plans in those decisions violated specific statutory requirements, however, neither case expressly addressed whether ERISA requires actuarial assumptions to be reasonable.  *See id.* at 162 (holding that plan's interest rates violated provisions of the internal revenue code); *Laurent*, 794 F.3d at 280 (finding plan definition of "normal retirement age" to be inconsistent with definition in ERISA § 3(24)).  The Circuit has nonetheless signaled its recognition of a reasonableness requirement, in a decision that determined that ERISA does not require plans to update their interest rate assumptions.  *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 207 (2d Cir. 2007) (affirming summary judgment based on district court's finding that discount rate was "not unreasonable").

Plaintiffs encourage the Court to adopt the definition of actuarial equivalence from a decision of the D.C. Circuit Court of Appeals which stated that "Congress intended that term of art to have its established meaning," according to which "[t]wo modes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions."  *Stephens v. U.S. Airways Grp., Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (citing a document prepared by the Society of Actuaries).  That definition, however, sheds little light on what actuarial assumptions are permissible under the statute.  As another district court has recently noted, a definition so "unmoored from any

concept of reasonableness ... could conceivably produce absurdly unfair results," such as the use of a mortality table from 1693. *Belknap v. Partners Healthcare Sys., Inc.,* No. CV 19-11437-FDS, 2020 WL 4506162, at *2 (D. Mass. Aug. 5, 2020). Acceptance of such an open-ended definition would not only conflict with the above-cited Second Circuit precedent but also with ERISA's broader purpose to protect beneficiaries of retirement plans.

Plaintiffs nonetheless insist that the *Stephens* definition, when read in light of the Act's definition of present value—"the value adjusted to reflect anticipated events," 29 U.S.C. § 1002(27)—demonstrates that ERISA incorporates a reasonableness requirement. Defendants do not dispute this general proposition, at least "[f]or purposes of their motion." *See* Reply at 7.

The Court concludes that ERISA requires that Plan administrators use reasonable actuarial assumptions when converting SLAs into alternative benefits. This interpretation of "actuarial equivalent" finds support in the caselaw and in Treasury's interpretation of the Act. Broadly speaking, some limits on the discretion of plan administrators in the selection of actuarial methodology are necessary to effectuate the protective purposes of ERISA, as recognized by the Second Circuit. The alternative interpretation, in which administrators have free reign to fashion the assumptions used to calculate actuarial equivalence, would permit all kinds of mischief inconsistent with that purpose. Allowing plans to set their own definition of actuarial equivalence would eliminate any protections provided by that requirement. The Act must therefore be read to impose some boundaries on the determination of equivalence. The use of reasonableness as a metric accords with Treasury's interpretation of the Act, as indicated by its implementing regulations. *See* 26 C.F.R. § 1.401(a)-11(b)(2) (stating that "actuarial . . . . [e]quivalence may be determined, on the basis of consistently applied reasonable actuarial factors."). That regulatory language, in particular the use of the more ambiguous "may" rather than "shall," does not clearly establish whether Treasury intended

reasonableness as a mandate or a recommendation.  The Court concludes that the imposition of reasonableness as a requirement is more consistent with the structure and purpose of the Act.

This conclusion places the Court in agreement with a consistent line of persuasive precedent. A court in the Eastern District of Wisconsin held last year that ERISA's requirement of actuarial equivalence obligates plans to "use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination."  *Smith v. Rockwell Automation, Inc.,* 438 F. Supp. 3d 912, 921 (E.D. Wis. 2020).  Consistent with that standard, numerous district courts have denied motions to dismiss actions challenging the use of purportedly unreasonable actuarial assumptions, which were not alleged to violate any other provision of ERISA.  *See Belknap,* 2020 WL 4506162 (use of "obsolete actuarial information from 1951 and outdated interest rates"); *Herndon v. Huntington Ingalls Indus., Inc*., No. 4:19-CV-52, 2020 WL 3053465, at *1 (E.D. Va. Feb. 20, 2020) (use of 1971 mortality table); *Cruz v. Raytheon Co.*, 435 F. Supp. 3d 350, 353 (D. Mass. 2020) (use of actuarial assumptions to calculate defendant's financial obligations in its SEC filings); *Torres v. Am. Airlines, Inc.,* 416 F. Supp. 3d 640, 648 (N.D. Tex. 2019) (use of 1984 mortality table); *Smith v. U.S. Bancorp*, No. CV 18-3405 (PAM/KMM), 2019 WL 2644204, at *1 (D. Minn. June 27, 2019) (use of factor used to reduce amount of benefit for early retirement); *see also Dooley v. Am. Airlines, Inc.,* No. CIV.A. 81 C 6770, 1993 WL 460849, at *10 (N.D. Ill. Nov. 4, 1993) ("The term 'actuarially equivalent' means equal in value to the present value of normal retirement benefits, determined on the basis of actuarial assumptions with respect to mortality and interest which are reasonable in the aggregate.").  The Court agrees with the reasoning of this robust consensus of authority.

In sum, the Court concludes that benefit plans must use actuarial assumptions that are reasonable in order to qualify as actuarially equivalent within the meaning of the Act.  As noted above, Defendants do not expressly dispute the reasonableness standard.  They argue instead that Plaintiffs

have failed to adequately plead unreasonableness, noting that reasonableness is a spectrum and that Treasury has endorsed the 1971 and 1983 tables as reasonable in another context, "when applying ERISA's nondiscrimination rules."  Mot. at 12, 17 (quoting *Wachtell, Lipton, Rosen & Katz v. Comm'r*, 26 F.3d 291, 296 (2d Cir. 1994)).  The Court is not persuaded.  That these same mortality tables are authorized in another context—namely to ascertain that employer-provided benefits under a defined-benefit plan are nondiscriminatory in amount so as not to favor highly compensated employees, shareholders, and officers over other employees—does not, as Defendants imply, make them reasonable as a matter of law. *See* Reply at 7.  Plaintiffs allege that these mortality tables fail to account "for advances in medicine and better collective lifestyle habits" and thereby decrease the amount of benefits that they receive.  Compl. ¶ 4.  They also allege that more recent mortality tables from 2000 and 2014 are not only available but used by both Treasury and the Society of Actuaries. *Id.* ¶¶ 68, 71.  The Court thus finds that Plaintiffs have plausibly alleged the Plan's use of those mortality tables is unreasonable in this context.  As a result, they have adequately pled a violation of ERISA Section 205, 29 U.S.C. § 1055.

For similar reasons, the Court finds that Plaintiffs have stated a viable claim under ERISA Section 203.  That section guarantees employees like Plaintiffs, who have completed at least five years of service, "a nonforfeitable right to 100 percent of the employee's accrued benefit derived from employer contributions."  29 U.S.C. § 1053(a).  In contrast to Section 205, forfeiture is measured not against an SLA but with respect to an employee's "accrued benefit," the definition of which may be determined by the plan itself, *see id*. § 1002(23)(A).  To state claim under Section 203, Plaintiffs must therefore plausibly allege that the actuarial assumptions reduced their benefits as compared to the Plan's default benefit.  As noted above, although Defendants' dispute the factual veracity of Plaintiffs' allegations of loss, the Court must accept those allegations as true on a motion to dismiss.  Courts

have recognized that "a reduction of the total value of all monthly benefits is a kind of forfeiture." *Contilli v. Loc. 705 Int'l Bhd. of Teamsters Pension Fund*, 559 F.3d 720, 722 (7th Cir. 2009) (citing *Berger v. Xerox Corp. Retirement Income Guarantee Plan*, 338 F.3d 755, 759 (7th Cir. 2003), *Esden*, 229 F.3d at 163).  Treasury regulations implementing the provision of the Internal Revenue Code that governs minimum-vesting standards similarly state that "[c]ertain adjustments to plan benefits such as adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." 26 C.F.R. § 1.411(a)-4(a).  Accordingly, the allegations here—reduction in benefits based on an unreasonable actuarial conversion—state a violation of ERISA's non-forfeiture requirements.  *See Torres,* 416 F. Supp. 3d at 650 ("Improper actuarial adjustments that reduce a pension's value is a forfeiture under ERISA § 203"); *Smith,* 2019 WL 2644204, at *3 ("[C]ourts have held that a distribution of pension benefits below the actuarial equivalent value can constitute a forfeiture of accrued benefits under § 1053(a).").

Defendants further argue that Plaintiffs' claim of fiduciary breach should be dismissed in the absence of any statutory violation.  Plaintiffs counter that they have alleged a statutory violation and that ERISA mandates that plan administrators follow plan terms consistent with the Act's substantive requirements.  Opp. at 12.  Plaintiffs correctly note that ERISA requires fiduciaries to discharge their duties in accordance with plan requirements insofar as those are consistent with the Act.  29 U.S.C. § 1104(a)(1)(D).  The Second Circuit has accordingly held that a violation of one of ERISA's substantive requirements may constitute a breach of the Act's requirements of fiduciary duty.  *See John Blair Commc'ns, Inc. Profit Sharing Plan v. Telemundo Grp., Inc. Profit Sharing Plan*, 26 F.3d 360, 367 (2d Cir. 1994).  Under that framework, Plaintiffs' allegations that Defendants administered a plan that did not meet ERISA's reasonableness requirements state a viable claim for breach of

fiduciary duty pursuant to 29 U.S.C. § 1104(a).  The Court accordingly denies the motion to dismiss on that basis.

**III.    Timeliness of Claims**

Defendants also argue that Masten's claims are time-barred by ERISA's six-year statute of limitations.  They maintain that both his claims—for substantive violation of the Act, and for a fiduciary breach—began accruing, at the latest, upon receipt of his retirement paperwork in November 2012.  The Complaint, initially filed on December 3, 2018, was therefore untimely.  Mot. at 22.  Without distinguishing between claims, Plaintiffs counter that the limitations period on "claims like Masten's" should begin "when he received his first payment" on  December 1, 2012.  *Id.* at 23.  At this stage of proceedings, the Court finds that dismissal on the basis of untimeliness is appropriate, but only for Masten's claim of fiduciary breach.

Determining when the statute of limitations begins to run in an ERISA action is a fact-dependent inquiry.  The Second Circuit, in the analogous context "of an ERISA miscalculation claim," has applied a "'reasonableness approach' that looks to 'when there is enough information available to the pensioner to assure that he knows or reasonably should know of the miscalculation.'" *Osberg v. Foot Locker, Inc.*, 862 F.3d 198, 206-07 (2d Cir. 2017) (quoting *Novella v. Westchester Cty.*, 661 F.3d 128, 137 & n.22 (2d Cir. 2011)).  Depending on the particular circumstances, the miscalculation may be "apparent from the face of a payment check" or "readily ... discoverable from information furnished to pensioners by the pension plan."  *Id.* at 207 (internal quotation marks omitted).  The Court must "determine in the first instance at what point the defendants provided sufficient information to each class member such that that pensioner should have been able to recognize the miscalculation."  *Novella*, 661 F.3d at 146.

Accepting as true the allegations in the Complaint, the Court cannot determine whether Masten had sufficient information prior to December 1, 2012—the latest date in which the claim could accrue in order for the Complaint to be timely—to determine that the Plan violates the Act in the manner alleged.  The November 15, 2012 pension-calculation statement that was provided to Masten, and which Defendants append to their motion, provides the amount of monthly payments under the various benefit options, but says nothing about how those amounts are calculated.  *See* Dkt. 47, Declaration of Russell L. Hirschhorn ("Hirschhorn Decl."), Ex. C.  That document cannot on its own demonstrate when Masten knew or should have known of the Plan's actuarial assumptions.  Defendants aver that the Plan itself specifies the mortality tables used to calculate alternative benefits, as evidenced by the Plan document submitted with their motion.  *See* Hirschhorn Decl., Ex. A § 1.02(a).  Although that may be true, the record does not demonstrate if, and when, Masten received that information.  *See* Opp. at 23 n.27 ("there is no evidence stating when or how Masten received [the Plan document]").  The version of the Plan proffered by Defendants is dated January 1, 2015, and includes amendments executed as late as 2018.  *See* Hirschhorn Decl., Ex. A.  What Masten knew as of December 2012 thus remains an open question.  The Court may ultimately conclude that the receipt of the Plan documents was sufficient to put Masten on notice of the ERISA violation.  The record at this stage, however, does not establish that such receipt occurred prior to the limitations period.  Accordingly, the motion to dismiss Masten's statutory claim on that basis is denied.

Defendants correctly argue that Masten's claims for fiduciary breach are subject to a different standard for determining the accrual date.  Pursuant to ERISA Section 413, "[n]o action may be commenced ... with respect to a fiduciary's breach of any responsibility, duty, or obligation" more than "six years after ... the date of the last action which constituted a part of the breach or violation" or "three years after the earliest date on which the plaintiff had actual knowledge of the breach or

violation." 29 U.S.C. § 1113.  In this case, the alleged fiduciary breach occurred with the selection of the outdated mortality tables as conversion factors, or the conversion of Masten's retirement benefits with those tables.  That breach must have taken place prior to November 15, 2012 when Masten selected retirement benefits that had already been converted under the challenged formula. As Masten received his first payment under the plan on December 1, 2012, the Court can also reasonably infer that he had knowledge of the alleged fiduciary breach as of, or soon after, that date, *i.e.*, more than three years before filing his complaint.   His claim of fiduciary breach must therefore be dismissed as untimely.

**IV.    Exhaustion of Administrative Remedies**

Lastly, Defendants contend that the action should be dismissed or stayed because Plaintiffs have not exhausted the administrative procedures outlined in the Plan.  Mot. at 23.  Plaintiffs maintain that administrative exhaustion is an affirmative defense rather than a jurisdictional requirement, and that Defendants have not met their burden of proving failure to exhaust.  The Court agrees that dismissal on the basis of failure to exhaust is not warranted at this stage.

The Second Circuit has stated that "exhaustion in the context of ERISA requires only those administrative appeals provided for in the relevant plan or policy." *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993).  Courts distinguish statutory claims, like the ones at issue here, from plan-based claims, which typically challenge benefit determinations and therefore require interpretation of the Plan terms.  *See, e.g., Nechis*, 421 F.3d at 101-02.  The Circuit "has not addressed the specific question whether exhaustion is required for statutory claims." *Id.; see Diamond v. Loc. 807 Lab. Mgmt. Pension Fund*, 595 F. App'x 22, 24 (2d Cir. 2014).  There is no dispute, however, that administrative exhaustion is an affirmative defense under ERISA.  *Paese v. Hartford Life & Acc. Ins. Co.,* 449 F.3d 435, 443 (2d Cir. 2006).

Without deciding whether exhaustion applies to Plaintiffs' statutory claims, the Court determines that Defendants have failed to meet their burden of establishing a failure to exhaust. First of all, they point to no provision of the Plan with which Plaintiffs failed to comply. Nor do they specify any available administrative processes that would allow Plaintiffs to adjudicate their claims about the reasonableness of actuarial assumptions. *Cf. Quigley v. Citigroup Supplemental Plan for Shearson Transfers*, No. 09 CIV. 8944 PGG, 2011 WL 1213218, at *7 (S.D.N.Y. Mar. 29, 2011) (dismissing action for denial of benefits upon rejection of Plaintiff's argument that Plan's exhaustion requirements should be excused as unreasonable and unenforceable), *aff'd*, 520 F. App'x 15 (2d Cir. 2013). In other words, the Court cannot determine from the record before it if the Plan "provide[s] a reasonable claims procedure that would yield a decision on the merits of the claim." 29 C.F.R. § 2560.503-1(l)(1). Defendants have failed to provide any guidance to the Court as to what administrative procedures Plaintiffs should complete in order to for their claims to become ripe for judicial review. The Court therefore declines to dismiss, or stay, the Complaint on the basis of failure to exhaust at this time.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted with respect to Masten's claims for breach of fiduciary duty and denied in all other respects. The Clerk of Court is respectfully directed to terminate item number 45 on the docket. The stay is hereby lifted.

By no later than June 28, 2021, the parties shall jointly submit to the Court a proposed case management plan and scheduling order. A template for the order is available at https://nysd.uscourts.gov/hon-ronnie-abrams. Counsel for both parties shall appear for a status conference on July 6, 2021 at 2:00 p.m. The Court will hold this conference by telephone. The parties

shall use the dial-in information provided below to call into the conference: Call-in Number: (888)

363-4749; Access Code: 1015508.  This conference line is open to the public.


SO ORDERED.

   Dated:       June 14, 2021
              New York, New York

_____
Ronnie Abrams
United States District Judge