# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Catherine McAlister, Pauline Walker, Lee Kernan, Emily Ross, Scott Batey, Mary Trivett and Joan Brownell, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   vs.<br><br>Metropolitan Life Insurance Company, MetLife Group, Inc. and the Metropolitan Life Insurance Company Employee Benefits Committee,<br><br>        Defendants. | Civil Action No. 18-cv-11229-RA<br><br><br><br><br>CLASS ACTION |

## SECOND AMENDED COMPLAINT

Plaintiffs Catherine McAlister, Pauline Walker, Lee Kernan, Emily Ross, Scott Batey, Mary Trivett and Joan Brownell, by and through their attorneys, on behalf of themselves and all others similarly situated, based on personal knowledge with respect to their own circumstances and based upon information and belief pursuant to the investigation of their counsel as to all other allegations, allege the following.

## INTRODUCTION

1.     This is a class action against Defendants, Metropolitan Life Insurance Company and MetLife Group, Inc. (together, "MetLife"), and the Metropolitan Life Insurance Company Employee Benefits Committee n/k/a the MetLife Group, Inc. Employee Benefits Committee (the "Committee"), concerning the failure to pay joint and survivor annuity ("JSA") benefits under the defined benefit MetLife Retirement Plan (the "Plan") in amounts that meet the actuarial equivalence requirements of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §

1001, *et seq.* ("ERISA").  Defendants' violation of ERISA's actuarial equivalence requirements caused and causes retirees to lose part of their vested retirement benefits in violation of ERISA.

2.      There are several formulae for how participants earn retirement benefits under the various parts of the Plan. Under each part, however, a participant can earn a retirement benefit in a specified form of a life annuity and can receive a pension in the form of a joint and survivor annuity, which is a payment streams for the life of the retiree and the life of the spouse after the retiree dies ("JSAs").  The spouse's benefits are expressed as a percentage of the benefit paid during the retiree's life.  The amount of monthly benefit that will be paid in the form of a JSA is calculated by applying a "conversion factor" to the participant's accrued benefit, ostensibly for the purpose of ensuring that the two benefits have the same present value.  The conversion factor is based on actuarial assumptions concerning mortality rates (which affect how long payments are likely to be made under each optional form of benefit), and interest rates used to discount future payments to present value.

3.      Under ERISA, JSAs with survivor annuities that are no less than 50%, and no more than 100%, of the annuity paid during the participant's lifetime ("Qualified Joint and Survivor Annuities" or "QJSAs") must be at least as valuable as any other benefit option that the plan participant can select at the same time.  In other words, a QJSA should have a present value that is at least as great as any other benefit that the plan participant could select when she begins collecting benefits.

4.      Because the Plan's conversion factors used to calculate the monthly benefits paid to participants who select QJSAs are based on assumptions about mortality and interest rates that are outdated and no longer reasonable, these QJSA options are less valuable than other benefit forms the participants could select, such as an annuity for the life of the participant only or a joint

and survivor annuity that has a 30% survivor benefit. Accordingly, the QJSA benefit options violate ERISA.

5.     The Plan has several different "parts," and the conversion factors used to calculate QJSA benefits under each of the different parts are slightly different. However, all of the conversion factors calculated using outdated actuarial assumptions.  The Plan's Traditional Part and the Cash Balance Part use the 1971 Group Annuity Mortality Table for Males (the "1971 GAM Table"), set back one year for participants and set back five years for beneficiaries and a 6% interest rate.  The NEF Part uses the 1983 Group Annuity Table ("1983 GAM Table") for males set-back one year and a 5% interest rate.

6.     The mortality assumptions are outdated because mortality rates have generally improved over time with advances in medicine and better collective lifestyle habits.  People who retired recently are expected to live longer than those who retired in previous generations. Consequently, older morality tables predict that people will die at a faster rate than current mortality tables, which MetLife knows since it uses its "mortality expertise" to sell annuities to ERISA plan sponsors and because its actuary, Milliman, regularly measured the mortality experience of the Plan's population, including a "comprehensive study" in 2014.

7.     Because older mortality tables like the 1971 and 1983 GAM tables used by the Plan predict that people will not live as long as more recent mortality tables, basing the QJSA conversion factor on such older mortality tables decreases the monthly payments retirees receive, resulting in benefits are materially ***lower*** than they would be if Defendants used actuarial assumptions that were reasonable and current when Plan participants retired.

8.     Because the Plan used old mortality tables, MetLife caused Plaintiffs and Class Members to receive benefits that violate ERISA's actuarial equivalence rules and to unknowingly

forfeit and lose part of their vested benefits in violation of ERISA's anti-forfeiture rule. *See* ERISA §§ 205(d) and 203(a), 29 U.S.C. §§ 1055(d) and 1053(a). By using outdated mortality assumptions, Defendants did not provide Plaintiffs with JSA benefits that are actuarially equivalent and reduced the present value of Plaintiffs' benefits. These improper reductions caused Plaintiffs and other participants and beneficiaries of the Plan to receive less than they should as a pension every month and will continue to affect them throughout their retirements.

9. Accordingly, Plaintiffs seek an Order from the Court reforming the Plan to conform to ERISA, payment of future benefits in accordance with the reformed Plan, as required under ERISA, payment of amounts improperly withheld, and such other relief as the Court determines to be just and equitable.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of the ERISA.

11. This Court has personal jurisdiction over MetLife because it is headquartered and transacts business in, or resides in, and has significant contacts with this District, and because ERISA provides for nationwide service of process.

12. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and MetLife resides and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because MetLife does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

# PARTIES

## Plaintiffs

13.     Plaintiff Catherine McAlister is a resident of Jacksonville, Florida and a Participant in the Plan.  Ms. McAlister worked for MetLife or its affiliates for approximately 40 years until her employment terminated in December 2014.  Ms. McAlister and her spouse began receiving a 100% JSA under the Traditional Part on January 1, 2015.

14.     Plaintiff Pauline Walker is a resident of Braintree, Massachusetts and a Participant in the Plan.  Ms. Walker worked for MetLife or its affiliates, including New England Life Insurance Company ("NEF"), for more than 12 years until her employment terminated in September 1993.  Ms. Walker and her husband began receiving a 50% JSA under the NEF Part on April 1, 2016.

15.     Plaintiff Lee Kernan is a resident of Hingham, Massachusetts and a Participant in the Plan.  Ms. Kernan worked for MetLife or its affiliates for more than 33 years until her employment terminated in January 2016.  Ms. Kernan and her husband began receiving a 50% JSA under the Traditional Part on August 1, 2016.

16.     Plaintiff Emily Ross is a resident of Quincy, Massachusetts and a Participant in the Plan.  Ms. Ross worked for MetLife or its affiliates for more than 35 years until her employment terminated in December, 2015.  Ms. Ross and her spouse began receiving a 50% JSA under the Traditional Part on January 1, 2016.

17.     Plaintiff Scott Batey is a resident of Hyde Park, Massachusetts and a Participant in the Plan.  Mr. Batey worked for MetLife or its affiliates for more than 31 years until his employment terminated in January, 2015.  Mr. Batey and his spouse began receiving a 50% JSA under the Traditional Part on March 1, 2015.

18.     Plaintiff Mary Trivett is a resident of Foxboro, Massachusetts and a Participant in the Plan.  Ms. Trivett worked for MetLife or its affiliates for almost 9 years until her employment terminated in May, 2005.  Ms. Trivett and her spouse began receiving a 50% JSA under the Traditional Part on December 1, 2020.

19.     Plaintiff Joan Brownell is a resident of Weddington, North Carolina and a Participant in the Plan.  She worked for MetLife or its affiliates for more than 41 years until her employment terminated in August, 2017.  Ms. Brownell and her spouse began receiving a 50% JSA under the Traditional Part on June 1, 2018.

**Defendants**

20.     MetLife Group, Inc. is among the largest providers of insurance, annuities and employee benefit programs in the U.S. It is a corporation organized under the laws of New York with its headquarters and principal place of business is New York, New York.

21.     Metropolitan Life Insurance Company ("MLIC") is a New York life insurance company with its headquarters and principal place of business is New York, New York.  MLIC sponsored the Plan through September 30, 2018 and was the Plan's named fiduciary. Since October 1, 2018, the Plan's sponsor has been MetLife Group, Inc.

22.     The Committee has fiduciary responsibility for the administration and operation of the Plan, as set forth in the Plan document.  MetLife delegated all of its fiduciary responsibilities with respect to the Plan to the Committee, which is a fiduciary for the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercises discretionary authority or control respecting the management of the Plan and the management or disposition of its assets.

# APPLICABLE ERISA REQUIREMENTS

## *Benefit Options*

23.     ERISA requires that benefits from a defined benefit plan be paid to married Participants in the form of a qualified joint and survivor annuity (a "QJSA") unless the Participant, with the consent of his or her spouse, elects an alternative form of payment. *See* ERISA § 205(a) and (b), 29 U.S.C. § 1055(a) and (b).  The Tax Code likewise provides that any "plan providing for the payment of benefits in any form of a life annuity" *must* provide that life annuity "in a form having the effect of a qualified joint and survivor annuity," a QJSA. 26 U.S.C. §401(a)-11(a)(1) and (1)(i).

24.     A QJSA is any JSA with a "survivor annuity for the life of the spouse which is not less than 50 percent of (and is not greater than 100 percent of)" than the amount payable during the participant and spouse's joint lives, and any annuity having the same effect. ERISA § 205(d)(1)(A), 29 U.S.C. § 1055(d)(1)(A); 26 U.S.C. §401(a)-11(b)(2).   For example, if a Participant receives $1,000 per month under a 50% joint and survivor annuity, the spouse will receive $500 a month after the Participant's death. ERISA's definition of QJSA "includes any annuity in a form having the effect of" providing the participant's spouse a survivor benefit between 50% and 100%.  If a plan has two or more actuarially equivalent JSAs that satisfy the requirements for a QJSA, the plan must designate the one which will be the Plan's default option for married participants.  26 C.F.R. § 1.401(a)-20 Q&A 16.  Under each part of the Plan, the QJSA designated as the Plan's default option for married participants is a 50% JSA.

25.     Spousal consent is required for a married participant to select an option other than a QJSA.  ERISA Section 205(c)(2)(A) and (5), 29 U.S.C. § 1055(c)(2)(A) and (5). Spousal consent is also required to revoke a prior benefit option selection, except where the participant's new choice

is a QJSA.  ERISA Section 205(c)(2)(A) and (5), 29 U.S.C. § 1055(c)(2)(A) and (5); 26 C.F.R. § 1.401(a)-20 Q&A 31.

26.     A plan can offer multiple JSA options that meet the definition of a QJSA, but it **must** offer one that is a "Qualified Optional Survivor Annuity" ("QOSA").  If the plan's default option for married participants is a QJSA with a survivor percentage of less than 75%, the plan must offer a 75% JSA as a QOSA; if the plan's default option is a QJSA with a survivor percentage of more than 75%, the plan must offer a 50% JSA as a QOSA.  *See* ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2); *see also* 26 U.S.C. § 417(g).

27.     ERISA also requires that defined benefit plans provide a qualified pre-retirement survivor annuity ("QPSA").  ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2).  A QPSA is an annuity for the life of the participant's surviving spouse (*i.e.*, a beneficiary) if the participant dies before reaching the plan's normal retirement age.  ERISA § 205(e), 29 U.S.C. § 1055(e).

### *Benefit Options Must Be Actuarially Equivalent*

28.     "If an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . ***shall be the actuarial equivalent of such benefit*** . . . ." 29 U.S.C. § 1054(c)(3) (emphasis added).

29.     Under ERISA, a QJSA must be at least actuarially equivalent to a single life annuity ("SLA").  *See* 29 U.S.C. § 1055(d)(1); 26 U.S.C. § 417(b).  Moreover, the applicable regulations provide that a QJSA "must be at least the actuarial equivalence of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan."[1] Indeed, a plan's QJSA

---

[1] *See* 26 C.F.R. § 1.401(a)-11(b)(ii)(2). The term "life annuity" includes annuities with terms certain in addition to single life annuities. As the Treasury Regulations explain, "[t]he term 'life annuity' means an annuity that provides retirement payments and requires that survival of the participant or his spouse as one of the conditions for payment or possible payment under the

8

"must be as least as valuable as any other optional form of benefit under the plan at the same time."

26 C.F.R. § 1.401(a)-20 Q&A 16.

30.     ERISA and the Tax Code both require that a QOSA be actuarially equivalent to an

SLA. *See* 29 U.S.C. § 1055(d)(2); 26 U.S.C. § 417(g).

31.     A QPSA must be actuarially equivalent to what the surviving spouse would have

received under the plan's designated QJSA.  ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

32.     ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the

vested portion of his or her normal retirement benefit is non-forfeitable.  ERISA § 204(c)(3), 29

U.S.C. § 1054(c)(3), provides that if an employee's accrued benefit is in the form other than an

SLA, the accrued benefit "shall be the actuarial equivalent" of an SLA.  The Treasury regulation

for the Tax Code provision corresponding to ERISA § 203 (26 U.S.C. § 411), states that

"adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable."

26 C.F.R. § 1.411(a)-4(a).

### *Reasonable Factors Must Be Used When Calculating Actuarial Equivalence*

33.     "Two modes of payment are actuarially equivalent when their present values are

***equal*** under a given set of assumptions." *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440

(D.C. Cir. 2011) (emphasis added).[2]  Actuarial equivalence should be "cost-neutral," meaning that

neither the Plan nor the participants should be better or worse off if the participant selects either

the normal retirement benefit or an optional form of benefit. See *Osberg v. Foot Locker, Inc.*, 138

F. Supp. 3d 517, 540 (S.D.N.Y. 2015).

---

annuity.  For example, annuities that make payments for 10 years or until death, whichever occurs
first or whichever occurs last, are life annuities."    26 C.F.R. § 1.401(a)-11(b)(1)(i)

[2] "Equivalent" means "equal." https://www.merriam-webster.com/dictionary/equivalent
"Equal" means the "same." https://www.merriam-webster.com/dictionary/equal

34.     Under ERISA, "present value" means "the value adjusted to reflect anticipated events. Such adjustments shall conform to such regulations as the Secretary of the Treasury may prescribe." ERISA § 3(27), 29 U.S.C. § 1002(27). The Secretary has prescribed numerous regulations describing how present value should reasonably reflect anticipated events, including:

(a)     The Treasury regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied ***reasonable actuarial factors***, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

(b)     A plan must determine optional benefits using "a single set of ***interest and mortality assumptions that are reasonable*** . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

(c)     With respect to benefits under a lump sum-based formula, any optional form of benefit must be "at least the actuarial equivalent, using ***reasonable actuarial assumptions*** . . . ." 26 C.F.R. § 1.411(a)(13)-1(b)(3) (emphasis added).

## SUBSTANTIVE ALLEGATIONS

## I.     The Plan

### A.     Overview

35.     MetLife established the Plan to "provide[] a solid foundation on which to build your financial freedom." *See* Plan's Summary Plan Description ("SPD"). MetLife sponsors the Plan.

36.     All Participants and beneficiaries of the Plan are current and former employees of MetLife, spouses of current and former employees, or other beneficiaries. Under the terms of the Plan, Participants are entitled to receive a monthly pension that begins at the Normal Retirement

Date following the Participant's 65th birthday, although various early retirement options are available. *See* Plan at § 1.39.

37.     The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

38.     The Plan is a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

39.     The Plan is administered by MetLife.  MetLife has delegated to the Committee the responsibility for carrying out at least some of its fiduciary responsibilities with respect to the Plan.

**B.      The Traditional Part**

40.     Under the Traditional Part, participants earn a retirement benefit based on a percentage of their compensation and how many years they worked for MetLife.  *See* Plan Document at Appendix A, § 4.02-A.  Participants can receive their Traditional Part benefits in several different forms, including JSAs that provide survivor benefits of 50, 60, 70, 75, 80, 90 and 100 percent of the annuity paid during the joint life of the participant and the participant's spouse.  Each of these JSA benefits is "in a form having the effect" of an annuity "for the life of a participant with a survivor annuity for the life of the spouse which is not less than 50 percent of (and is not greater than 100% of) the amount of the annuity which is payable during the joint lives of the participant and the spouse," and thus is a QJSA which must meet ERISA's actuarial equivalence requirements.  ERISA Section 205(d)(1), 29 U.S.C. § 1055(d)(1).  Because the Plan's "default" option for married participants is the 50% JSA, the Plan's 75% JSA also meets the statutory requirements for a QOSA.

41.     The Plan allows participants to revoke a prior benefit selection and choose any of the Traditional Part's QJSA options without obtaining spousal consent, consistent with ERISA

Section 205(c)(2)(A) and (5), 29 U.S.C. § 1055(c)(2)(A) and (5) and 26 C.F.R. § 1.401(a)-20 Q&A 31. Plan Document at Appendix A, § 5.04-A ("[T]he consent of the spouse is not required for any revocation, amendment or change of election whereby a Participant or Former Participant selects. . . .[a JSA] where the named survivor is the Participant's or Former Participant's spouse and the survivor annuity is at least 50% of the payment" during their joint lives).

42.     Before July 1, 2008, participants accrued benefits under Traditional Part as a 5-year certain-and-life annuity (a "5YCLA"). Plan Document at § 1.01(d) and Appendix A, § 5.05-A. The Traditional Part also offered a 30% JSA that provided the same monthly benefit as the 5YCLA. The QJSA benefits – the JSAs with survivor benefits of between 50-100% – are calculated by converting the 30% JSA to the QJSA forms using conversion factors based on the 1971 GAM Table set back 1 year for participants and 5 years for beneficiaries and a 6% interest rate. *See* Plan Document at § 1.02(a) and Appendix A, §§ 5.02-A and 5.05-A.

43.     Beginning July 1, 2008, active participants began accruing benefits under the Traditional Part as a 12-year life and certain annuity (a "12YCLA"), but the amount payable in that form could not be less than it was as a 5YCLA as of June 30, 2008. *See* Plan Document at § 1.01(d). The conversion factors used to calculate the QJSA benefits were still based on the 1971 GAM (with setbacks) and a 6% interest rate to a the 50% JSA. *Id*.

44.     The Traditional Part provides benefits for the beneficiaries of participants that die before they begin receiving their pension benefits. If the participant is married, the surviving spouse will receive a pre-retirement survivor annuity based on the value of the 50% JSA that the participant had accrued when the participant died, *i.e.*, a QPSA under ERISA § 205(e). *See* 2015 SPD at p. 21.

45.     In sum, Defendants calculated QJSAs, QOSAs and QPSAs under the Traditional Part using the 1971 GAM table (with setbacks) and a 6% interest rate.  MetLife calculated the benefits of Plaintiffs McAlister, Kernan, Ross, Brownell, Batey and Trivett using these actuarial assumptions.

### C.      The NEF Part

46.     The Plan's NEF Part was formerly the pension plan for employees of New England Financial.  In 1995, MetLife purchased New England Financial and the NEF Part was merged into the Plan on December 31, 2000.  *See* SPD at 17.  Upon the merger, active participants in the NEF Part, *i.e.,* those who still worked for MetLife, began accruing benefits under the Traditional Part's formula.[3]

47.     Under the NEF Part, participants earn a retirement benefit in the form of an SLA. The SLA is NEF Part's "normal form annuity" and the default form of benefits for unmarried participants.  *See* Plan Document at Appendix C, §§ 1.29-C and 3.01-C.  The NEF Part defines "Qualified Joint and Survivor Annuity" as a JSA with a survivor benefit payable to the Participant's spouse that "is neither (i) less than one-half of, nor (ii) greater than [100%]" of the amount payable during their joint lives."  Plan Document at Appendix C, § 1.42-C.  The NEF Part offers joint and survivor annuities in 10% increments, including those with survivor percentages of 50, 60, 70, 80, 90 and 100 that are each a "Qualified Joint and Survivor Annuity."  *Id*. and at §

---

[3] The Plan has "Special Transition Provisions" for participants that earned benefits under the NEF Part.  *See* SPD at 27.  For participants that also earned benefits under the Traditional Part, their benefit under the Traditional Part is the greater of: (a) their benefit calculated under the Traditional Part's formula for their combined service between MetLife and NEF; and (b) the total of: (i) their benefits under the NEF Part as of December 31, 2000; and (ii) their benefits under the Traditional Part starting January 1, 2001.  Plan Document at Appendix A, § 4.02-A(f); SPD at 27.  For participants who meet certain age and service requirements, their entire Plan benefit is calculated under the NEF Part's formula as of December 31, 2010.  *See* SPD at 27.

4.08-C.[4]  "In the absence of a direction by the Participant as to which form of the Qualified Joint and Survivor Annuity" the participant wants, a married participant's benefits under the NEF Part are paid as a 50% QJSA.  *Id.* at § 1.42-C.

48.      The NEF Part provides that each "Qualified Joint and Survivor Annuity will be "the Actuarial Equivalent of [SLA]" due under the terms of the NEF Part.  *See* Plan Document at Appendix C, at § 1.42-C.

49.      The Plan calculates all QJSAs by converting their SLA using a conversion factor which is based on the outdated 1983 Group Annuity Table for males, with one (1) year age set-back, without projection, and interest of five percent (5%)."  *See* Plan Document at Appendix C, §§ 4.08-C and 1.02-C.

50.      Plaintiff Walker had benefits calculated using these actuarial assumptions.

**E.      The Cash Balance Part**

51.      In 2002, the Plan transitioned the Traditional Part's final average pay formula to a cash balance formula in the Cash Balance Part.  Under the Cash Balance Part, MetLife contributes a percentage of a participant's compensation to personal retirement account ("PRA"), which accumulate interest at a rate based on 30-year Treasury securities rate in November of the previous year.  *See* SPD at 7-8.

52.      All Plan participants hired in 2002 or later accrued benefits under the Cash Balance Part.  *See* SPD at 3.  Plan participants who were "active" in 2003, *i.e.*, employed by MetLife, had the option of continuing to accrue benefits under the Traditional Part or NEF Part or to begin accruing benefits under the Cash Balance Part effective January 1, 2003.  *See* SPD at 3.  Active

---

[4] It is not clear whether the NEF Part offered a 75% JSA.

participants who chose to participate in the Cash Balance Part maintained the benefits they accrued under the Traditional Part and/or NEF Part.  *See* SPD at 22.

53.     While participants' PRAs have a certain hypothetical value, *e.g.*, $100,000, the "accrued benefit" under the Cash Balance Part is a 5YCLA which is the "actuarial equivalent" of the participant's PRA.  *See* Plan Document at § 1.01.[5]  Participants can also receive their benefits in other forms, including 50, 60, 70, 75, 80, 90 and 100 percent JSAs.  *See* Plan Document at § 5.05(e).  Each of these JSA benefits is "in a form having the effect" of an annuity "for the life of a participant with a survivor annuity for the life of the spouse which is not less than 50 percent of (and is not greater than 100% of) the amount of the annuity which is payable during the joint lives of the participant and the spouse," and thus is a QJSA which must meet ERISA's actuarial equivalence requirements.  ERISA Section 205(d)(1), 29 U.S.C. § 1055(d)(1).  Because the Plan's "default" option for married participants is the 50% JSA, the 75% JSA also meets the statutory requirements for a QOSA.  To calculate these JSA benefits, Defendants apply a conversion factor to the benefit amounts payable as a 5YCLA based on the 1971 GAM Table with setbacks and a 6% interest rate.  *See* Plan Document at §§ 5.05, 1.02(a).

54.     Accordingly, Defendants calculate QJSAs and QOSAs under the Cash Balance Part using the 1971 GAM table (with setbacks) and a 6% interest rate.

---

[5] To convert the PRA to a 5YCLA, Defendants used the 1994 GAM mortality table projected to 2002 with Scale AA, blended 50% male/50% female and the rate for 30-year Treasury securities in November of the previous year until 2014.  *See* Plan Document at § 1.02(c)(1).  In 2015, pursuant to a Plan amendment, MetLife began using the Treasury Assumptions to calculate the 5YCLA under the Cash Balance Part.  *See* Plan Document at Amendment 3.

## II.   The Plan Provides QJSAs, QOSAs and QPSAs that Do Not Satisfy ERISA's Actuarial Equivalence Requirements

55.     The QJSA, QOSA and QPSA benefits offered by the Plan, as described above, do not satisfy ERISA's actuarial equivalence requirements because they are based on outdated mortality assumptions that lower their present values and the monthly benefits that participants and beneficiaries receive.

### A.   Actuarial Equivalence Must Be Based on Reasonable Actuarial Assumptions.

56.     To determine whether two benefits are actuarially equivalent, the present value of the ***aggregate*** (*i.e.,* total) future benefits that the participant (and, if applicable, the beneficiary) is expected to receive under both forms must be determined.  The present values are then compared using a conversion factor.[6]  There are two main components of these present value calculations: an interest rate and a mortality table.

57.     An interest rate is used to determine the present value of each future payment.  This is based on the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability to earn investment returns.  The rate that is used is often called a "discount rate" because it discounts the value of a future payment.

58.     As discussed above, the interest rate used by a defined benefit plan to calculate present value must be reasonable based on prevailing market conditions which "reflect anticipated events." *See* 29 U.S.C. § 1002(27).  The interest rate may be broken into segments of short-term, medium-term and long-term expectations pertaining to each future payment. *See, e.g.*, ERISA §§ 205(g)(3)(B)(iii) and 303(h)(2), 29 U.S.C. §§ 1055(g)(3)(B)(iii) and 1083(h)(2).

---

[6] The conversion factor is easily calculated by a computer model.  Defendants simply input the assumptions and the model instantaneously calculates the conversion factor.

59. A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

60. More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth. The Society of Actuaries ("SOA"), an independent actuarial group, publishes the mortality tables that are the most widely-used by defined benefit plans when doing these conversions. The SOA published mortality tables in 1971 (the "1971 GAM"), 1983, 1984 (the "UP 1984"), 1994 (the "1994 GAR"), 2000 (the "RP-2000") and 2014 ("RP-2014") to account for changes to a population's mortality experience.

61. Since at least the 1980s, the life expectancies in mortality tables have improved as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1. According to this paper, there have been "increasing life expectancies over time" and just moving from the 2000 mortality table to the 2014 table would increase pension liabilities by 7%.

62.     Pursuant to Actuarial Standard of Practice 27, para. 3.5.3 of the Actuarial Standards Board,[7] actuarial tables must be adjusted on an ongoing basis to reflect improvements in mortality.[8] Accordingly, in the years between the publication of a new mortality table, mortality rates are "projected" to future years to account for expected improvements in mortality.

63.     For purposes of the present value analysis under ERISA, the mortality table must be updated and reasonable "to reflect anticipated events." 29 USC § 1002 (27). As an example, the U.S. Treasury department designates mortality tables and interest rates that must be used in the calculation of lump sum benefits. These "Treasury Assumptions" are regularly updated and reasonable. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv). Thus, in 2017, the Treasury Mortality Table was the RP-2000 mortality table adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected improvements in mortality. IRS Notice 2016-50.[9] In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014. IRS Notice 2017-60.[10] (the "2018 Treasury Mortality Table").

64.     Using a reasonable interest rate and mortality table, the present values of two forms of benefit can be compared to determine whether they are actuarially equivalent.

65.     Changes to interest rates or mortality assumptions can have dramatic effects on the conversion factor and the value of an alternative form of benefit. When a high interest rate is used,

---

[7] Courts look to professional actuarial standards as part of this analysis. See, e.g. *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (citing Jeff L. Schwartzmann & Ralph Garfield, Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1–24–91 (1991)).

[8] *See* http://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/#353-mortality-and-mortality-improvement.

[9] *See* https://www.irs.gov/pub/irs-drop/n-16-50.pdf.

[10] *See* https://www.irs.gov/pub/irs-drop/n-17-60.pdf.

the amount of the monthly benefit under a joint and survivor annuity increases. Conversely, using an antiquated mortality table generates lower present values of future payments, and the amount of the monthly benefit under a joint and survivor annuity decreases.

66. Plans must use reasonable interest rates and mortality tables to evaluate whether the present values of benefit options produce equivalent benefits for participants and beneficiaries.

**B.     The Plan Does Not Use Reasonable Actuarial Assumptions to Calculate QJSAs, QOSAs and QPSAs, Reducing Participants' Benefits in Violation of ERISA.**

67. Throughout the Class Period, Defendants used a 6% interest rate and the 1971 GAM table, set back one year for Participants and set back five years for beneficiaries, to calculate QJSAs, QOSAs and QPSAs under the Traditional Part and QJSAs and QOSAs under the Cash Balance Part. Defendants have not provided the participants and beneficiaries receiving these benefits with actuarially equivalent benefits.[11]

68. Defendants' use of the 1971 GAM table to calculate the actuarially equivalent value of QJSAs, QOSAs and QPSAs is unreasonable because the 1971 GAM table is severely outdated and does not "reflect anticipated events" (i.e., the anticipated mortality rates of participants).

69. The 1971 GAM table is nearly **50 years** out of date, and as such, it overstates mortality rates. According to the Centers for Disease Control and Prevention, in 1970, a 65-year-old had an average life expectancy of 15.2 years.[12] In 2010, a 65-year-old had a 19.1-year life expectancy, a 26% increase. Accordingly, by 2010, the average employee would have expected to

_____

[11] The Cash Balance Part provides surviving spouses with a survivorship benefit that is greater than what ERISA requires as a QPSA benefit. Accordingly, beneficiaries receiving this subsidized benefit are not included in the proposed Class.
[12] *See* https://www.cdc.gov/nchs/data/hus/2011/022.pdf.

receive, and the average employer would have expected to pay, benefits for a substantially longer period of time than in 1971.

70. Throughout the Class Period, Defendants used a 5% interest rate and the 1983 GAM table, set back one year, without projection, to calculate QJSAs under the NEF Part. Defendants' use of these actuarial assumptions does not provide the participants and beneficiaries receiving these benefits with actuarially equivalent benefits.

71. Defendants' use of the 1983 GAM table was unreasonable because it is outdated and overstates mortality rates compared to current actuarial tables.

72. The setbacks the Plan uses with both the 1971 GAM table and the 1983 GAM table do not correct for the impact of the tables' outdated mortality assumptions.

73. Using the 1971 GAM table and the 1983 GAM table decreased the value of the QJSAs, QOSAs and QPSAs, thereby materially reducing the monthly benefits that Participants and beneficiaries receive in comparison to the monthly benefits Participants and beneficiaries would receive if the Plan used updated, reasonable mortality assumptions.

74. MetLife knew that the 1971 GAM table and the 1983 GAM table were outdated and unreasonable and that using them produced lower monthly benefits for participants and beneficiaries receiving any of the alternative forms of benefit that were calculated with these outdated mortality tables.

75. To sell its annuity products, MetLife told potential customers that "on average, people are living longer," and told the sponsors of 401(k) plans that "Americans can expect to live longer than at any time in our nation's history," citing the RP-2000 mortality table for statistics on how long retirees in ERISA plans were now expected to live. Indeed, MetLife boasts of its "mortality expertise" when it sells group annuity contracts to pension plan sponsors.

76.     MetLife also knew that the 1971 GAM table and the 1983 GAM table were inconsistent with the mortality experience of Plan participants and beneficiaries. MetLife, in conjunction with Milliman, regularly performed experience studies, including that showed that the Plan's mortality experience was significantly better (i.e., fewer deaths) than the mortality tables that MetLife used to calculate benefits.

77.     Moreover, MetLife uses up-to-date actuarial assumptions when calculating pension plan costs in its audited financial statements that it prepares with the assistance of an independent auditor.   Under Generally Accepted Accounting Principles (GAAP), mortality assumptions "should represent the 'best estimate' for that assumption as of the current measurement date."[13] In its Annual Report to Shareholders filed with the SEC on Form 10-k, in calculating pension plan costs, MetLife represents as follows:

> ***Changes in Our Assumptions Regarding the Discount Rate, Expected Rate of Return, Mortality Rates and Expected Increase in Compensation Used for Our Pension and Other Postretirement Benefit Plans May Result***

---

[13] "Many entities rely on their actuarial firms for advice or recommendations related to demographic assumptions, such as the mortality assumption. Frequently, actuaries recommend published tables that reflect broad-based studies of mortality. Under ASC 715-30 and ASC 715-60, each assumption should represent the "best estimate" for that assumption as of the current measurement date. The mortality tables used and adjustments made (e.g., for longevity improvements) should be appropriate for the employee base covered under the plan. Last year, the Retirement Plans Experience Committee of the Society of Actuaries (SOA) released a new set of mortality tables (RP-2014) and a new companion mortality improvement scale (MP-2014). Further, on October 8, 2015, the SOA released an updated mortality improvement scale, MP-2015, which shows a decline in the recently observed longevity improvements. Although entities are not required to use SOA mortality tables, the SOA is a leading provider of actuarial research, and its mortality tables and mortality improvement scales are widely used by plan sponsors as a starting point for developing their mortality assumptions. Accordingly, it is advisable for entities, with the help of their actuaries, to (1) continue monitoring the availability of updates to mortality tables and experience studies and (2) consider whether these updates should be incorporated in the current-year mortality assumption." *See*, Deloitte, Financial Reporting Considerations Related to Pension and Other Postretirement Benefits, Financial Reporting Alert 15-4, October 30, 2015 at 3.     https://www2.deloitte.com/content/dam/Deloitte/us/Documents/audit/ASC/FRA/  2015/us-aers-fra-financial-reporting-considerations-related-to-pension-and-other-postretirement-benefits-103015.pdf

*in Increased Expenses and Reduce Our Profitability* (emphasis in original).

We determine our pension and other postretirement benefit plan costs **based on our best estimates of future plan experience**. **These assumptions are reviewed regularly** and include discount rates, expected rates of return on plan assets, **mortality rates**, expected increases in compensation levels and expected medical inflation. Changes in these assumptions may result in increased expenses and reduce our profitability.[14]

78. MetLife used updated mortality tables in its financial statements throughout the Class Period. In the audited financial statements, MetLife used reasonable actuarial assumptions to report a greater liability for benefits than they were paying out using the unreasonable 1971 GAM table and the unreasonable 1983 GAM table. For example, MetLife used the RP-2000 mortality table projected using Scale AA for the year ending December 31, 2011, prior to the beginning of the Class Period, to calculate its pension costs, an assumption it told shareholders that was chosen "in consultation with its external consulting actuarial firms" based on "expected benefit payout streams."[15] In its Form 5500 for the year ending December 31, 2017, MetLife used the RP-2000 projected using 175% of Scale AA as its mortality assumption to "estimate. . . .the incidence of benefit payments." The Form 5500 provided the rationale for using this mortality assumption:

### Demographic Assumptions

**Rationale for Demographic Assumptions:** Demographic assumptions were set based on Milliman's 2014 experience study dated September 16, 2014 and input from the plan sponsor.

79. MetLife again changed the mortality assumption that it used to calculate its liabilities for paying Plan benefits, as explained in the Plan's Form 5500 for the year 2018:

---

[14] MetLife's Form 10-k for year ending December 31, 2017, at 77 (emphasis added).
[15] MetLife's Form 10-K for year ending December 31, 2011, at 238.

RP-2006 mortality tables projected with 70% of the MP-2016 scale.

**Rationale:** The mortality experience was analyzed in Milliman's 2017 Experience Study Report dated October 31, 2017. The mortality table selected is in line with that experience and represents the actuary's best estimate of future mortality.

**Change in assumption:** Mortality tables were changed from the Generational RP-2000 separate annuitant and non-annuitant mortality tables, projected with 175% of Scale AA, for males and females to the RP-2006 mortality tables projected with 70% of the MP-2016 scale. The change was made to reflect the actuary's best estimate of future mortality.

80.     There is no reasonable justification for MetLife to use an old mortality table that presumes an early death and an early end to benefit payments in order to calculate an unfairly low annual benefit for participants, while at the same time using a reasonable mortality table to project a longer duration of these very same annual benefit payments for annual financial reporting. Since these two analyses measure the length of the very same lives and the very same benefit streams, they should use the same mortality assumptions. "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit; rather we stated, 'If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence.'" *Laurent v. Price WaterhouseCoopers LLP*, 794 F.3d 272 (2d Cir. 2015) *quoting*, *Edsen v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000).

81.     Defendants likewise use the reasonable Treasury Mortality Table when they convert a retiree's retirement account cash balance under the Cash Balance Part into a 5YCLA:

> The [cash] balance shall be converted to an ***actuarial equivalent*** of a 5 Year Certain and Life Annuity at retirement using the 30-Year Treasury Rate for the preceding November and ***the applicable mortality table (as defined in IRC § 417(e))***.

2017 Form 5500, Schedule SB, Part V (emphasis added); *see also* Plan Document at Amendment 3 (changing interest rate to the segment rates in I.R.C. § 417(e)). This is important in two respects.

First, it demonstrates that MetLife knows how to select reasonable mortality assumptions. Second, because older mortality tables assume people will live for a shorter period of time, using an older mortality table to convert a cash balance account to an annuity produces a larger monthly annuity payment, whereas using a more current table produces a smaller monthly benefit. Thus, MetLife uses an up-to-date mortality table for calculations where a newer table reduces the amount the Plan pays out but uses 40- or 50-year-old-tables for JSA conversions because the older tables reduce the amount the Plan pays out.

82.     Although MetLife uses reasonable mortality tables when calculating actuarial present values for its obligations to shareholders, it knowingly and wrongfully uses the 1971 GAM table, a mortality table nearly 50 years our-of-date, and the 1983 GAM table, a table that is 35 years out-of-date, to calculate the benefits of Plaintiffs and Class Members. This was not an oversight. MetLife boasts of its extensive "mortality expertise" when it sells plan sponsors group annuity contracts and other annuity products.

83.     MetLife knowingly misrepresented to Participants that their QJSAs, QOSAs and QPSAs that were calculated using the 1971 GAM table and the 1983 GAM table were actuarially equivalent to the benefits they earned under the Plan.

84.     During the Class Period, Defendants' use of the 1971 GAM table to calculate JSAs was unreasonable.

85.     Likewise, during the Class Period, Defendants' use of the 1983 GAM table to calculate JSAs was unreasonable.

86.     Had Defendants used reasonable actuarial assumptions, such as the Treasury Assumptions, or the mortality assumptions based on the Plan's credible mortality experience,

Plaintiffs and the Class would have received, and would continue to receive, actuarially equivalent benefits that are greater than the benefits they currently receive.

87. Plaintiff McAlister began receiving benefits at age 63 when her spouse was 67. She earned benefits under the NEF Part and the Traditional Part, but her Plan benefit was calculated under the Traditional Part. She selected a 100% QJSA, which pays $576.73 per month. Defendants calculated her benefit using the 1971 GAM table (with setbacks) and a 6% interest rate. Defendants' use of these outdated actuarial assumptions reduced the monthly benefit that McAlister receives each month compared to what her benefits would be if her benefits were actuarially equivalent to the SLA or the 30% JSA she could have selected, based on reasonable actuarial assumptions, such as the Treasury Assumptions for the year she began receiving benefits.

88. Plaintiff Walker began receiving benefits at age 65 when her spouse was 68 and 6 months. She earned benefits under the NEF Part. She selected the default 50% QJSA, which pays $814.85 per month. Defendants calculated her benefit using the 1983 GAM and a 5% interest rate. Defendants' use of these outdated actuarial assumptions reduced the monthly benefit that Walker receives each month compared to what her benefits would be if her benefits were actuarially equivalent to the 30% JSA she could have selected, based on reasonable actuarial assumptions, such as the Treasury Assumptions for the year she began receiving benefits.

89. Plaintiff Kernan began receiving benefits at age 58 and 11 months when her spouse was 59 and 3 months. She earned benefits under the NEF Part and the Traditional Part, but her Plan benefit was calculated under the Traditional Part. She selected the default 50% QJSA, which pays $6,442.95 per month. Defendants calculated her benefit using the 1971 GAM table and a 6% discount rate. Defendants' use of these outdated actuarial assumptions reduced the monthly benefit that Kernan receives each month compared to what her benefits would be if her

benefits were actuarially equivalent to the SLA or the 30% JSA she could have selected, based on reasonable actuarial assumptions, such as the Treasury Assumptions for the year she began receiving benefits.

90.    Plaintiff Ross began receiving benefits at age 64 when her spouse was 65 and 7 months. She earned benefits under the NEF Part and the Traditional Part, but her Plan benefit was calculated under the Traditional Part's formula. She selected the default 50% QJSA, which pays $4,511.68 per month. Defendants calculated her benefit using the 1971 GAM table and a 6% discount rate. Defendants' use of these outdated actuarial assumptions reduced the monthly benefit that Ross receives each month compared to what her benefits would be if her benefits were actuarially equivalent to the SLA or the 30% JSA she could have selected, based on reasonable actuarial assumptions, such as the Treasury Assumptions for the year she began receiving benefits.

91.    Plaintiff Batey began receiving benefits at age 55 when his spouse was 58 and 10 months. He earned benefits under the NEF Part and the Traditional Part, but his Plan benefit was calculated under the Traditional Part. He selected the default 50% QJSA, which pays $4,145.69 per month. Defendants calculated his benefit using the 1971 GAM table and a 6% discount rate. Defendants' use of these outdated actuarial assumptions reduced the monthly benefit that Batey receives each month compared to what his benefits would be if his benefits were actuarially equivalent to the SLA or the 30% JSA he could have selected, based on reasonable actuarial assumptions, such as the Treasury Assumptions for the year he began receiving benefits.

92.    Plaintiff Trivett began receiving benefits at age 64 and 11 months when her spouse was 66 and 6 months. She earned benefits NEF Part and the Traditional Part, but her Plan benefit was calculated under the Traditional Part. She selected the default 50% QJSA, which pays $811.08 per month. Defendants calculated her benefit using the 1971 GAM table and a 6% discount rate.

Defendants' use of these outdated actuarial assumptions reduced the monthly benefit that Trivett receives each month compared to what her benefits would be if her benefits were actuarially equivalent to the SLA or the 30% JSA she could have selected, based on reasonable actuarial assumptions, such as the Treasury Assumptions for the year she began receiving benefits.

93.     Plaintiff Brownell began receiving benefits at age 60 when her spouse was 64 and 3 months.  She earned benefits under NEF Part and the Traditional Part, but her Plan benefit was calculated under the Traditional Part.  She selected the default 50% QJSA, which pays $5,051.16 per month.  Defendants calculated her benefit using the 1971 GAM table and a 6% discount rate. Defendants' use of these outdated actuarial assumptions reduced the monthly benefit that Brownell receives each month compared to what her benefits would be if her benefits were actuarially equivalent to the SLA or the 30% JSA she could have selected, based on reasonable actuarial assumptions, such as the Treasury Assumptions for the year she began receiving benefits.

94.     According to the Plan's Form 5500, the actuarial present value of the accumulated Plan benefits was over $7 billion.  Discovery will likely show that Defendants' use of unreasonable actuarial assumptions deprives retirees and their spouses out of tens of millions of dollars.

95.     Because the Plan used grossly outdated, unreasonable mortality tables throughout the Class Period, the QJSA and QOSA benefits paid to Participants and beneficiaries under the Traditional Part, the NEF Part and the Cash Balance Part are less than the actuarial equivalent of the SLAs or 30% JSA that participants could have selected, in violation of ERISA § 205(d)(1)(B), 29 U.S.C. § 1055(d)(1)(B) and ERISA § 205(d)(2)(A), 29 U.S.C. § 1055(d)(2)(A).  These outdated actuarial assumptions also improperly reduced the survivor benefits paid under the Traditional Part and NEF Part's QPSA provisions.

96.     Plaintiffs are Participants of the Plan who are receiving QJSAs that Defendants calculated using the 1971 GAM and the 1983 GAM tables.  Because their benefits were calculated using outdated, unreasonable mortality tables, Plaintiffs have been harmed because they are receiving less each month than they would if the Plan used current, reasonable actuarial assumptions.  They, along with other class members, have been substantially damaged as a result of receiving benefits below an actuarially equivalent amount.

## CLASS ACTION ALLEGATIONS

97.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the class (the "Class") defined as follows:

> (1)     All Plan Participants who are receiving a QJSA or QOSA calculated under the Traditional Part, the NEF Part or the Cash Balance Part of the Plan, who began receiving benefits at any time from January 1, 2013 until the date of judgment; (2) all beneficiaries of such Plan Participants; and (3) all persons who are receiving QPSA benefits under the Traditional Part of the Plan who began receiving benefits at any time from January 1, 2013 until the date of judgment.  Excluded from the Class are Defendants and any individuals who are subsequently to be determined to be fiduciaries of the Plan.

98.     The members of the Class are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes thousands of persons. MetLife employs nearly 50,000 individuals and the Plan in question covers all U.S. salaried or commissioned employees who have completed a year of service. *See* Form 5500, Schedule SB, Part V.

99.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims and the claims of all Class members arise out of the same policies and practices as alleged herein, and all members of the Class are similarly affected by MetLife's wrongful conduct.

100.	There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

      A.	Whether the Plan's formulae for calculating QJSAs, QOSAs and QPSAs provide benefits that are actuarially equivalent under ERISA's requirements;

      B.	Whether the Plan's actuarial assumptions used to calculate the QJSAs, QOSAs and QPSAs are reasonable;

      C.	Whether the Plan should be reformed to comply with ERISA; and

      D.	Whether Plaintiffs and Class members should receive additional benefits.

101.	Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class actions.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

102.	This action may be properly certified under either subsection of Rule 23(b)(1).  Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

103.     In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

104.     In the alternative, certification under Rule 23(b)(3) is warranted because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**FIRST CLAIM FOR RELIEF**
**Declaratory and Equitable Relief**
**(ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))**

105.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

106.     The Plan improperly reduces annuity benefits for participants and beneficiaries in the Traditional, NEF and Cash Balance Parts who receive QJSAs and QOSAs below the amounts that they would receive if those benefits satisfied ERISA's actuarial equivalence requirements. The Plan also improperly reduces the QPSAs that surviving spouses in the Traditional Part receive because those benefits based on a QJSA that does not satisfy ERISA's actuarial equivalence requirements.

107.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

108. Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the Plan's established methodologies for calculating QJSAs, QOSAs and QPSAs violate ERISA's actuarial equivalence requirements. By not providing actuarially equivalent benefits, MetLife has violated ERISA §§ 205(d) and (e), 29 U.S.C. §§ 1055(d) and (e), and the statute's anti-forfeiture clause, ERISA § 203(a), 29 U.S.C. § 1053(a).

109. Plaintiffs further seek orders from the Court providing a full range of equitable relief, including but not limited to:

(a) re-calculation, correction and payment of benefits for QJSAs, QOSAs and QPSAs;

(b) an "accounting" of all prior benefits and payments;

(c) a surcharge;

(d) disgorgement of amounts wrongfully withheld;

(e) disgorgement of profits earned on amounts wrongfully withheld;

(f) a constructive trust;

(g) an equitable lien;

(h) an injunction against further violations; and

(i) other relief the Court deems just and proper.

**SECOND CLAIM FOR RELIEF**
**For Reformation of the Plan and Recovery of Benefits Under the Reformed Plan**
**(ERISA § 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3))**

110. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

111.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

112.     The Plan improperly reduces annuity benefits for participants and beneficiaries in the Traditional, NEF and Cash Balance Parts who receive QJSAs and QOSAs below the amounts that they would receive if those benefits satisfied ERISA's actuarial equivalence requirements. The Plan also improperly reduces the QPSAs that surviving spouses in the Traditional Part receive because those benefits based on a QJSA that does not satisfy ERISA's actuarial equivalence requirements. By not providing actuarially equivalent benefits, Defendants have violated ERISA §§ 205(d) and (e), 29 U.S.C. §§ 1055(d) and (e), and the statute's anti-forfeiture clause, ERISA § 203(a), 29 U.S.C. § 1053(a).

113.     Plaintiffs are entitled to reformation of the Plan to require Defendants to provide actuarially equivalent benefits.

114.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

115.     Plaintiffs are entitled to recover actuarially equivalent benefits, to enforce their rights to the payment of past and future actuarially equivalent benefits, and to clarify their rights to future actuarially equivalent benefits, under the Plan following reformation.

## THIRD CLAIM FOR RELIEF
### Breach of Fiduciary Duty, on Behalf of Plaintiffs McAlister, Walker, Kernan, Trivett and Brown
### (ERISA §§ 404 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))

116.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

117.     As the Plan's administrator, MetLife is a named fiduciary of the Plan.

118.     The Committee is a named fiduciary of the Plan.

119.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

120.     The Committee is a fiduciary for the Plan because it exercised discretionary authority or control respecting the management of the Plan or exercised management or disposition of Plan assets.  In particular, it had authority or control over the amount and payment of QJSAs, QOSAs and QPSAs that were paid from Plan assets.

121.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan insofar as the Plan is consistent with ERISA.

122.     The Plan is not consistent with ERISA because it uses: (a) the outdated 1971 GAM table, coupled with a 6% interest rate, and the outdated 1983 GAM table, coupled with a 5% interest rate, to calculate QJSAs, QOSAs and QPSAs. As a result, the Plan improperly reduces annuity benefits for participants and beneficiaries in the Traditional, NEF and Cash Balance Parts who receive QJSAs and QOSAs below the amounts that they would receive if those benefits satisfied ERISA's actuarial equivalence requirements.  The Plan also improperly reduces the QPSAs that surviving spouses in the Traditional Part receive because those benefits based on a QJSA that does not satisfy ERISA's actuarial equivalence requirements.

123.     In following the Plan, which did not confirm with ERISA, the Committee exercised its fiduciary duties and control over Plan assets in breach of their fiduciary duties.

124.     ERISA imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance with ERISA.  In allowing the Committee to pay benefits that were not actuarially equivalent in violation of ERISA, MetLife breached its fiduciary duty to supervise and monitor the Committee.

125.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

126.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the Plan's established methodologies for calculating actuarially equivalent QJSAs, QOSAs and QPSAs violate ERISA.

127.     Plaintiffs further seek orders from the Court providing a full range of equitable relief, including but not limited to:

(a)     re-calculation, correction, and payments of Class Members' benefits;

(b)     an "accounting" of all prior benefits and payments;

(c)     a surcharge;

(d)     disgorgement of amounts wrongfully withheld;

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     Certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Declaring that the Plan fails to properly calculate and pay benefits in violation of ERISA's actuarial equivalence requirements;

C.     Ordering Defendants to bring the Plan into compliance with ERISA, including, but not limited to, reforming the Plan to bring it into compliance with ERISA with respect to calculation of actuarially equivalent benefits;

D.     Ordering Defendants to correct and recalculate benefits that have been paid;

E.     Ordering Defendants to provide an "accounting" of all prior payments of benefits under the Plan to determine the proper amounts that should have been paid;

F.     Ordering Defendants to pay all benefits improperly withheld, including under the theories of surcharge and disgorgement;

G.     Ordering Defendants to disgorge any profits earned on amounts improperly withheld;

H.     Imposition of a constructive trust;

I.     Imposition of an equitable lien;

J.     Reformation of the Plan;

K.     Ordering Defendants to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

L.     Ordering Defendants to pay future benefits in accordance with the terms of the Plan, as reformed.

M.     Awarding, declaring, or otherwise providing Plaintiffs and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper;

N.     Awarding attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

O.     Any other relief the Court determines is just and proper.

Dated: October 21, 2021 Respectfully submitted,

 *Robert A. Izard*
**IZARD, KINDALL & RAABE LLP**
Robert A. Izard (admitted *pro hac vice*)
Mark P. Kindall
Douglas P. Needham
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
Email: rizard@ikrlaw.com
Email: mkindall@ikrlaw.com
Email: dneedham@ikrlaw.com

**BAILEY & GLASSER LLP**
Gregory Y. Porter (admitted *pro hac vice*)
Mark G. Boyko
1054 31st Street, NW, Suite 230
Washington, DC 20007
(202) 463-2101
(202) 463-2103 fax
gporter@baileyglasser.com
mboyko@baileyglasser.com

***Counsel for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.


_Robert A. Izard_
Robert A. Izard