UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CATHERINE MCALISTER, PAULINE
WALKER, LEE KERNAN, EMILY ROSS,
SCOTT BATEY, MARY TRIVETT, and JOAN
BROWNELL, *on behalf of themselves and all
others similarly situated*,

                    Plaintiffs,


          v.


METROPOLITAN LIFE INSURANCE
COMPANY, METLIFE GROUP, INC., and
THE METROPOLITAN LIFE INSURANCE
COMPANY EMPLOYEE BENEFITS
COMMITTEE,

                    Defendants.

No. 18-cv-11229 (RA)

<u>MEMORANDUM
OPINION & ORDER</u>

---

RONNIE ABRAMS, United States District Judge:

        This is an action brought by former employees of Defendant Metropolitan Life Insurance

Company ("MetLife") who allege that the calculation of benefits offered under their retirement

plan (the "Plan") violates Section 205(d) of the Employee Retirement Income Act of 1974

("ERISA"). Three of the Plaintiffs—Lee Kernan, Emily Ross, and Joan Brownell—now seek to

certify a class of participants in the Plan who elected to receive their retirement benefits in the

form of a joint and survivor annuity. Pending before the Court is Magistrate Judge Wang's Report

and Recommendation (the "R&R") recommending that the motion for class certification be

granted. For the reasons that follow, the Court adopts the conclusions of the R&R and certifies the

proposed class pursuant to Rule 23(b)(1)(A).

## BACKGROUND

The facts of this case are detailed, among elsewhere, in the Court's opinion in *Masten v. Metropolitan Life Insurance Co.*, 543 F. Supp. 3d 25 (S.D.N.Y. 2021), and the Court recites only those facts that are necessary to resolving the instant motion.[1]

Plaintiffs are former employees of the Metropolitan Life Insurance Company ("MetLife") and participants in the MetLife Retirement Plan ("the Plan"). Second Am. Compl. ("SAC") ¶¶ 13–19. Under the Plan's Traditional Part—the part of the Plan relevant to the motion for class certification—participants can choose to receive one of several forms of retirement benefits, including a single life annuity ("SLA"), which is a defined-benefit payment for the duration of the pensioner's life, or a joint and survivor annuity ("JSA"), which is an annuity that can be reduced from a participant's single life annuity amount at payment commencement, and continued for the rest of the participant's spouse's life if the participant dies before the spouse. Dkt. 156-1, Plaintiffs' Expert Report of Ian Altman ("Altman Report") § 2; Dkt. 47-1 at § 5.05. The SLA and JSA are each calculated by means of a "conversion" from the starting benefit, or a certain life annuity ("CLA"), a type of benefit that guarantees a minimum number of years of annuity payments, even if the participant dies sooner. Dkt. 47-1 at § 1.02; Dkt. 151-1, Defendants' Expert Rebuttal Report of Jack Abraham ("Abraham Report") ¶¶ 7, 15, 17. According to Defendants, the SLA and JSA are calculated such that "each alternative payment form has a present value that is equal to the present value of the Accrued Benefit," i.e., the CLA, "notwithstanding that each has a different expected payment stream." Obj. at 4.

As is relevant here, Plaintiffs contend that ERISA requires qualified JSAs to be at least the "actuarial equivalent" of the SLA offered to participants under the Plan. *See* 29 U.S.C.

---

[1] Named plaintiff William Masten was voluntarily dismissed on October 21, 2021.

§ 1055(d)(1)(B); 26 C.F.R. § 1.401(a)-20 Q & A-16 (a qualified JSA "must be as least as valuable as any other optional form of benefit under the plan at the same time"). Plaintiffs allege that to calculate the JSA, the Plan uses outdated mortality tables that predict participants will die earlier than current mortality assumptions, thus reducing the amount of the monthly benefit under a JSA. SAC ¶ 65. As a result, Plaintiffs allege, their benefit payments are less than the "actuarial equivalent" of the SLA offered under the Plan, contravening ERISA's requirement that qualified JSAs be "at least as valuable as any other benefit option that the plan participant can select at the same time." *Id.* ¶¶ 1–4.

After the Court denied Defendants' Motion to Dismiss, *Masten*, 543 F. Supp. 3d at 39, the parties engaged in expert class discovery, and Plaintiffs moved to certify a class consisting of all participants and their beneficiaries who began receiving pension benefits:

> (1) on or after January 1, 2013;
> (2) in the form of a joint and survivor annuity with a survivorship percentage between 50% and 100%;
> (3) whose benefit was calculated entirely using the Traditional Part's formula; and
> (4) not calculated under Section 4.02-A or 5.02-A of the Plan as of June 30, 2008.

Dkt. 141, Mot. for Class Certification at 4. In addition, "[e]xcluded from the Class are Defendants and any individuals who are subsequently to be determined to be fiduciaries of the Plan." *Id.* That proposed class definition, which consists of 1,824 participants, is narrower than the class described in the Second Amended Complaint and does not include all the 3,996 Plan participants who elected a JSA of 50% or greater. According to Plaintiffs, the proposed class excludes the participants whose benefits were calculated under Section 4.02-A or 5.02-A of the Plan as of June 30, 2008 (the "as of June 2008" group) because those participants have a different benefit structure.[2] Altman Report at §§ 1(c), 18–19. According to Plaintiffs, each class member's "benefits were calculated

---

[2] The proposed class excludes several of the named Plaintiffs, including Scott Batey and Cathy McAlister, who are proceeding on an individual basis. Dkt. 141 at 4 n.4.

under the Traditional Part, using the same formulae and actuarial assumptions," including a mortality table they allege is outdated. Mot. for Class Certification at 3. They argue that all class members "are receiving JSAs with survivorship percentages between 50% and 100% that are not actuarially equivalent to the SLA they were offered." *Id.* According to Defendants' expert, however, "[t]he Plan is designed such that the alternative benefits are intended to be actuarially equivalent to each other and to the accrued benefit." Abraham Report ¶ 60; *see id.* ¶ 7 (explaining that the Plan "provides for the purported class members that (1) all optional forms be calculated from the Accrued Benefit and (2) all optional payment forms be actuarially equivalent when the assumptions are applied on a consistent basis").

Of the 1,824 class members, 464 participants signed releases when their employment was terminated as a condition of receiving benefits under MetLife's severance plans. For example, Plaintiff Brownell signed a separation agreement that released MetLife

> from any and all claims . . . of any and every kind or nature that you ever had, now have, or may have, whether known or unknown, against the Company arising out of any act, omission, transaction, or occurrence, up to and including the date you execute this Agreement, including, but not limited to: (i) any claim arising out of or related to your employment by and affiliation with the Company or the discontinuance thereof; (ii) any claim of employment discrimination, harassment, or retaliation, or any alleged violation of any federal state or local law . . . including but not limited to . . . Title VII of the Civil Rights Act of 1964 . . . the Americans with Disabilities Act of 1990; [and] the Employee Retirement Income Security Act of 1974 ("ERISA")[.]

Dkt. 152-2 at 1. Brownell's release states that it does not apply, however, to "any rights or benefits that vested or were otherwise payable to you prior to your execution of this Agreement under any employee benefit plans governed by ERISA." *Id.* Plaintiff Ross signed a release that is similarly broad—though it does not expressly reference ERISA claims—and includes a carveout with nearly identical language. Dkt. 152-1 at 1. The releases of the other Plaintiffs contain carveouts that are virtually identical as well. *See* Dkt. 152-3; Dkt. 152-4; Dkt. 152-5.

4

On March 17, 2023, Judge Wang issued her R&R recommending that the Court certify the proposed class and divide it into two subclasses "based on whether the employee signed a release upon their separation from MetLife." R&R at 17. Judge Wang reasoned that Plaintiffs had identified several common legal and factual issues, including:

> (i) which actuarial assumptions should be used to determine whether JSA benefits are actuarially equivalent to the SLA offered to participants when they started receiving benefits;
> (ii) whether the conversion factors generated by the Plan's terms improperly reduce the JSA benefits received by the putative class members; and
> (iii) [w]hether ERISA requires that [qualified JSA] . . . benefits be "actuarially equivalent" to the SLAs offered to participants when they start receiving benefits[.]

*Id.* at 14. Defendants timely objected.

## DISCUSSION

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). A court must undertake a *de novo* review of those portions of a report to which timely and specific objections have been made. *Id*; *see* Fed. R. Civ. P. 72(b)(3).

Defendants raise three objections to the R&R. First, they object to Judge Wang's conclusion that she need not resolve Defendants' challenge to the viability of Plaintiffs' methodology for determining actuarial equivalence at the class certification stage. Obj. at 1. Second, they argue that Judge Wang failed to consider that the class "improperly excludes Plan participants who have claims for relief under Plaintiffs' theory." *Id.* at 2. Third, they contend that the subclass of class members who signed releases recommended by Judge Wang does not meet any of the Rule 23(a) requirements and precludes certification under Rule 23(b). *Id.* at 22. Applying *de novo* review, the Court addresses each objection in turn.

## I.      Methodology Used by Plaintiffs' Expert

Defendants' initial objection is based on two challenges to the methodology used by Plaintiffs' expert. They argue first that Plaintiffs incorrectly used a "two-step conversion process" to calculate the JSA, and second, that Plaintiffs relied on one methodology to the exclusion of other reasonable assumptions "that would generate different outcomes for different class members." Obj. at 15. According to Defendants, the R&R should have—but did not—resolve the differences in the parties' proposed methodologies for determining the viability of Plaintiffs' Section 205(d) claim.

Courts have an obligation to resolve factual disputes relevant to each Rule 23 requirement. *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251 (2d Cir. 2011). A court must receive "enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204 (2d Cir. 2008) (citation omitted). At the class certification stage, however, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *see also In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) (explaining that a class certification motion must "not become a pretext for a partial trial of the merits"). To support class certification, plaintiffs "need not show" that the questions common to the class "will be answered, on the merits, in favor of the class." *Johnson v. Nextel Commc'n Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (quoting *Amgen*, 568 U.S. at 459). Rather, they must demonstrate by a preponderance of the evidence that the requirements of Rule 23 have been met. *Id.* at 137.

According to Defendants, Plaintiffs' expert incorrectly used a "two-step conversion process" to compare the SLA and the JSA, first using the Plan's assumptions to "calculate" the SLA—assumptions that Plaintiffs allege are outdated—and then using their proposed "reasonable" assumptions to convert the SLA to the JSA. Obj. at 7. Defendants argue that this methodology "contravenes the Plan's design and ERISA" and thus "cannot serve as a basis for sustaining a class claim for relief." *Id.* at 16. The Court disagrees.

As an initial matter, Defendants' assertion—that Plaintiffs "calculate[ed]" the SLA—misconstrues their methodology. As Plaintiffs' expert makes clear, he used "the [SLAs] that participants were offered" under the Plan, which were "shown in the Data Sets that Defendants produced." Dkt. 156-3, Plaintiffs' Reply Expert Report of Ian Altman ("Altman Reply Report") § 17; *see* Altman Report § 20; Dkt. 151-2, Altman Deposition Tr. at 131:12-20; *id.* at 194:10-13 (Q: "But you're not substituting your assumptions for how the single life annuity is calculated in the first place?" Altman: "That is a fair statement."). He then compared the SLA that participants were offered with the JSA they received to determine whether the Plan is consistent with ERISA's requirement that plans provide JSAs that are the "actuarial equivalent of [an SLA] for the life of the participant" offered under the relevant plan. Resp. at 2–3 (quoting 29 U.S.C. § 1055(d)); *see* 26 C.F.R. § 1.401(a)-11(b)(2) (explaining that a joint and survivor annuity must be the actuarial equivalent of any optional form of life annuity "offered under the plan"); Altman Reply Report ¶ 17 ("I determined whether the [JSA] benefits that participants are receiving are actuarially equivalent to the [SLA] that participants were offered, both of which were shown in the Data Sets that Defendants produced."). To calculate damages, Plaintiffs' expert compared participants' existing JSA with a hypothetical JSA converted from the SLA using updated mortality assumptions. Altman Report §§ 15, 16; Altman Deposition Tr. at 194:4–9. As Judge Wang

explained, Defendants' approach, by contrast, "recalculated the SLA" from the CLA using Plaintiffs' more recent longevity assumptions, which were "not supported by the Plan, and then used *that* SLA amount—rather than the SLA actually offered—to suggest that the JSA and SLA amounts offered to Plan participants were actuarially equivalent." R&R at 14 (emphasis in original).

According to Defendants, their methodology is the correct one, because the SLA and JSA are both calculated separately from the CLA under the Plan, which requires that "all optional forms be actuarially equivalent when the assumptions are applied on a consistent basis." Abraham Report ¶ 7. Defendants argue that if Plaintiffs' assumptions were applied "in a consistent manner"—i.e., to calculate both the SLA and the JSA from the CLA—the result would be a "varied impact amongst the purported class members depending on each individual's age and the age of their spouse," *id.*, and "hundreds of participants would not be entitled to a larger JSA," Obj. at 18. According to Defendants, if Plaintiffs' "reasonable assumptions were plugged into the Plan for purposes of performing the conversions that the Plan contemplates," then "the SLA and [JSA] benefits would necessarily be actuarially equivalent." Abraham Report ¶ 120.

Defendants may ultimately be correct that the Plan's scheme of deriving both the SLA and the JSA from the CLA renders Plaintiffs' methodology inapt. Indeed, there is some logic to Defendants' argument, given that Plaintiffs' methodology compares an SLA calculated using outdated mortality assumptions with a JSA calculated using more recent assumptions. But Defendants fail to convince the Court how the adoption of their methodology in Plaintiffs' stead makes this action incapable of resolution on a classwide basis. If Defendants are correct that Plaintiffs' assumptions must be applied consistently, and the result is—as Defendants urge—that "the [JSA] and SLA benefits will be actuarially equivalent to each other," Dkt. 150, Opp. to Class

Certification at 25, then they will have effectively defeated Plaintiffs' theory of the case *on the merits*: namely, that the Plan "did not provide Plaintiffs with JSA benefits that are actuarially equivalent." SAC ¶ 8; *see also* 26 C.F.R. § 1.401(a)-11 (explaining that "[e]quivalence may be determined, on the basis of consistently applied reasonable actuarial factors . . . for all [Plan] participants"). Put differently, instead of identifying material differences among class members that would preclude certification, "what [Defendants] allege[ ] is a fatal *similarity*—an alleged failure of proof as to an element of the plaintiffs' cause of action" that applies to the class as a whole. *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020) (emphasis added) (quoting *Amgen*, 568 U.S. at 470). As Judge Wang correctly concluded, Defendants' objection is fundamentally a merits question, not a class certification question.

According to Defendants, the adoption of their methodology would "leave[] Plaintiffs without a class claim since hundreds of participants would not be entitled to a larger JSA." Obj. at 18. But the possibility that the adoption of Defendants' alternative methodology would result in a "varied impact" among purported class members does not defeat certification, Abraham Report ¶ 7, even if it may ultimately necessitate a different result on the merits of Plaintiffs' claims. Another district court in this Circuit rejected a similar argument, also in the context of certifying a Rule 23(b)(3) class, in *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig*ation, 256 F.R.D. 82 (D. Conn. 2009). There, the defendants claimed that the plaintiffs' model for proving damages, if "done slightly differently, demonstrates that at least half the class suffered no damages and thus plaintiffs have not presented a feasible method for proving classwide damages." *Id.* at 100. The court rejected that argument, explaining that the "the real question" was "whether the plaintiffs have established a workable [model], not whether plaintiffs' model actually works, because the issue at class certification is not which expert is the most credible, or the most accurate

modeler, but rather have the plaintiffs demonstrated that there is a way to prove a class-wide measure of damages through generalized proof." *Id.* Plaintiffs here have done that, proposing a methodology that, while contested in its accuracy, "is consistent with [their] classwide theory of liability and capable of measurement on a classwide basis." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 123 n.8 (2d Cir. 2013) (citation omitted); *see also Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 186 (S.D.N.Y. 2008) (explaining that a "'battle of the experts' is not appropriate at the class certification stage, as the relevant question is only whether Plaintiffs' expert's methodology will apply to the entire class").

Defendants rely on *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) and *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), but those cases are readily distinguishable. In *Dukes*, the Supreme Court held that a putative class of plaintiffs alleging employment discrimination failed to establish commonality because Wal-Mart's policy of giving discretion to lower management over individual employment decisions, as well as the absence of a companywide policy or "common mode of exercising discretion" among individual managers, defeated any "common question" for the purposes of Rule 23(a)(2). 564 U.S. at 356. The Court explained that the 1.5 million putative class members "held a multitude of jobs, at different levels of Wal-Mart's hierarchy, for variable lengths of time, in 3,400 stores . . . with a kaleidoscope of supervisors . . . subject to a variety of regional policies." *Id.* at 360–61. Here, by contrast, Plaintiffs have identified one "general policy"—namely, the Plan's formula, "evidenced by the standardized terms contained in the annuity contracts that governed [Defendants'] relationship with the Plan[] and participants." *Haddock v. Nationwide Fin. Servs., Inc.*, 293 F.R.D. 272, 285 (D. Conn. 2013) (distinguishing *Wal-Mart* in the context of ERISA claims). And in *Comcast*, the Court held that certification of a Rule 23(b)(3) class was improper where plaintiffs failed to propose a model

capable of measuring class-wide damages attributable to their theory of liability. 569 U.S. at 35–38. Plaintiffs here have proposed such a model, even if Defendants do not agree it is the correct one.

The two out-of-Circuit cases upon which Defendants rely also do not compel a different conclusion. In *Torres v. American Airlines, Inc.*, 2020 WL 3485580 (N.D. Tex. May 22, 2020), the court denied class certification because some class members would be harmed if it granted the relief plaintiffs sought and the challenged plan were reformed, thus contravening "ERISA's principal function: to protect contractually defined benefits." *Id.* at *12 (internal quotation omitted). But Plaintiffs here only seek reformation as a form of relief for one of their claims. SAC at 30–35. In any event, as the Second Circuit has made clear, district courts have discretion to fashion "'appropriate equitable relief' to redress the [ERISA] violation" consistent with ERISA's requirements, "including reformation." *Laurent v. PricewaterhouseCoopers LLP*, 945 F.3d 739, 746, 748 (2d Cir. 2019) (quoting 29 U.S.C. § 1132(a)(3)); *see also id.* at 748 (explaining that, in crafting relief under ERISA, "courts are to be guided by equitable principles, as modified by the obligations and injuries identified by ERISA itself"); *McDonald v. Pension Plan of NYSA-ILA Pension Tr. Fund*, 320 F.3d 151, 161 (2d Cir. 2003) (noting that ERISA "affords district courts the discretion to fashion appropriate equitable relief—relief that may or may not benefit non-party beneficiaries"). By Defendants' logic, moreover, the same problem would arise even if a class were not certified, because if a Plaintiff were to prevail on an individual basis, the Plan could still be reformed to the benefit of some Plan participants and not others.

Defendants also cite *Thorne v. U.S. Bancorp*, 2021 WL 1977126 (D. Minn. May 18, 2021) in support of their argument that Plaintiffs' proposed model ignores other "reasonable" assumptions that would generate different outcomes for different class members. But in *Thorne*,

the plaintiffs' expert proposed six alternative models with different actuarial assumptions, each of which resulted in lower benefits for some putative class members. *Id.* at *2. By contrast, Plaintiffs here have proposed one model, which, if applied according to their methodology, would result in an increase in benefits for all the class members. Altman Report § 18.[3]

Finally, "[e]ven after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation." *Hill v. City of New York*, 2019 WL 1900503, at *2 (E.D.N.Y. Apr. 29, 2019) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)) (modifying class definition for purposes of settlement). In the event that any potential conflict does prove to be "fundamental," then "the proper way to solve the problem would be to address it if it arises," either "by dividing some of the subclasses and appointing new class representatives," *Laurent v. PricewaterhouseCoopers, LLP*, 2014 WL 2893303, at *4 (S.D.N.Y. June 26, 2014), or by modifying the class as the litigation goes forward, *see In re Ashanti Goldfields Sec. Litig.*, 2004 WL 626810, at *18 (E.D.N.Y. Mar. 30, 2004). The same is true if it becomes apparent that Rule 23's requirements are not met with respect to the parties' methodological argument. *See Mazzei v. Money Store*, 308 F.R.D. 92, 113 (S.D.N.Y. 2015) (decertifying class after trial), *aff'd*, 829 F.3d 260 (2d Cir. 2016).

In sum, Judge Wang did not err in deferring resolution of the parties' dispute on the merits of Plaintiffs' methodology. Defendants' first objection is thus overruled.

---

[3] In any event, the possibility that other actuarially reasonable models could produce different damages assessments does not, standing alone, create the kind of "fundamental" conflict necessary to defeat class certification. *See, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 551 (S.D.N.Y. 2018) (explaining that conflicts created by class members' differing preferences "for one but-for . . . model over others" based on which model would maximize their recovery according to their particular trading positions "do not rise to the level of 'fundamental' conflicts that preclude a finding of adequacy of representation"); *In re J.P. Morgan Stable Value Fund ERISA Litig.*, 2017 WL 1273963, at *10 (S.D.N.Y. Mar. 31, 2017) ("Although certain class members may prefer different class periods, courts in this district have found that issues related to differing preferred damages periods do not preclude certification.").

## II.     Exclusion of Certain Plan Participants from the Class

Defendants next assert that Judge Wang failed to consider their claim that the proposed class was "improperly gerrymandered" by excluding Plan participants whose benefits were calculated using the assumptions Plaintiffs allege are outdated, but who would not be entitled to relief under their methodology. Obj. at 20. According to Defendants, the exclusion from the class of the "as of June 2008" group—"*i.e.*, participants who . . . are in the Traditional Formula, but who commenced benefits at some time between 1993 and June 30, 2008," Obj. at 14—contravenes ERISA by failing to protect the interests of Plan participants who would be affected by the outcome of the lawsuit. *Id.* at 9, 20–22.

Defendants' second objection is similarly unpersuasive. As Plaintiffs point out, their class definition takes into account the Plan's use of different formulas and actuarial assumptions to calculate the JSA. Resp. at 12. Plaintiffs' expert explains that the "as of June 2008" participants have a different benefit structure than the members of the proposed class, receiving a subsidized benefit that "provides more generous joint and survivor benefits." Altman Deposition Tr. at 120:17–23. As a result, even though the same challenged actuarial assumptions were applied to the "as of June 2008" group, the Plan offset the impact of the allegedly unreasonable assumptions to that group. *Id.* at 121:17–19. Plaintiffs have accordingly defined their class to include class members that had "the same benefit structure and had their benefits calculated using the same formula and, because of that formula, did not receive an actuarially equivalent benefit." Resp. at 13.

Neither ERISA nor Rule 23 requires the certification of a class that includes all plan participants. For example, in *In re J.P. Morgan Stable Value Fund ERISA Litigation*, 2017 WL 1273963, at *3–4, 10 (S.D.N.Y. Mar. 31, 2017), another judge in this District certified a class of

ERISA plan participants limited to those whose investment fund "underperformed" a relevant benchmark. Contrary to Defendants' argument, moreover, the case's outcome will not limit the "as of June 2008" group's right to relief since they "cannot be bound by any orders or judgments" to which they are not a party. *Rothstein v. Am. Int'l Grp., Inc.*, 837 F.3d 195, 204 (2d Cir. 2016) (citation omitted). Indeed, Defendants' argument that a "gerrymandered" class creates the "risk of relitigating the same issue with potentially inconsistent outcomes," Obj. at 22, applies with greater force if no class is certified at all.

Defendants cite three cases, *Coan v. Kaufman*, 457 F.3d 250, 259–61 (2d Cir. 2006), *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 188 (2d Cir. 2021), and *Fish v. Greatbanc Trust Co.*, 667 F. Supp. 2d 949, 952 (N.D. Ill. 2009), in support of the assertion that participants seeking plan-wide relief "must establish that they represent the interests of *all* participants." Obj. at 21. Those cases are inapposite. In each, the plaintiffs brought claims pursuant to ERISA § 502(a)(2), which allows beneficiaries to seek relief against plan fiduciaries on behalf of a plan to "make good to such plan any losses to the plan." 29 U.S.C. § 1109. Section 502(a)(2) claims "may not be made for individual relief, but instead are 'brought in a representative capacity on behalf of the plan.'" *Coan*, 457 F.3d at 257 (quoting *Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985)). By contrast, Plaintiffs here do not assert any claims on behalf of the Plan, instead asserting individual claims under ERISA §§ 502(a)(1) and (a)(3). Accordingly, the Court rejects Defendants' second objection.

### III.     Subclass of Plan Participants Who Signed Releases

Defendants' third and final objection is that the release subclass recommended by Judge Wang does not independently meet the requirements of Rules 23(a) and (b). Obj. at 22. They argue that the Named Plaintiffs' claims are not typical of the subclass and the subclass "does not share

common claims and defenses" for two principal reasons: first, a determination of whether the releases they executed are enforceable "entails a fact-specific, individualized investigation into whether the release was 'knowing and voluntary,'" Obj. at 23, and second, the releases were executed at different times and contain different terms, *id.* at 24.  The Court again disagrees.

As Judge Wang concluded, the releases contain "virtually identical language," R&R at 12, with each general release containing a carveout for "any benefits or rights that vested prior to your execution of this Agreement under employee benefit plans governed by ERISA." Dkt. 152-1 at 1 (Ross Release). Moreover, the releases each cover only claims "up to and including the date you execute this Agreement," i.e., the time the beneficiary's employment was terminated and prior to the time that the class members began receiving benefits. *See, e.g.*, Dkt. 152-1 at 1.[4] Given that the releases signed by Plaintiffs contain "substantially similar language," they are "subject to treatment on a class-wide basis." *In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 75-76 (S.D.N.Y. 2006) (certifying class involving claims brought under ERISA § 502(a)(2) on behalf of plan).

The R&R is consistent with the decisions of other courts granting class certification notwithstanding the existence of a release. *See In re J.P. Morgan*, 2017 WL 1273963, at *11 (finding that release defense did not produce "fundamental" conflict and, in any event, could be addressed through the creation of a subclass); *Sexton v. Franklin First Fin., Ltd.*, 2009 WL 1706535, at *9 (E.D.N.Y. June 16, 2009) (rejecting "individualized inquiry objection" as it related to some plaintiffs' release agreements where "[t]he legal validity of such agreements are likely to apply across the board or fail as a matter of law"); *see also Ruppert v. Alliant Energy Cash Balance*

---

[4] Defendants argue that Brownell's release, which includes "any claim for any enhancement or differential calculation over and above the benefit vested or otherwise payable to you under the standard terms" of the Plan, narrows the scope of the carveout. Obj. at 10; Dkt. 152-1 at 1. But as Plaintiffs persuasively respond, Brownell, like the other Plaintiffs, brings a claim for the benefits to which she is allegedly entitled under ERISA, not an "enhancement" that is "over and above the benefit vested." Resp. at 20.

*Pension Plan*, 255 F.R.D. 628, 635 (W.D. Wis. 2009) (certifying class even though individual releases contained carveouts "related to plaintiff's pension benefit rights" with differing terms, and concluding that releases would likely not apply because "agreements that waive future violations of ERISA are unenforceable"); *Nelson v. IPALCO Enters.*, 2003 WL 23101792, at *6–8 (S.D. Ind. Sept. 30, 2003) (granting certification where release defense was "susceptible to resolution on a class-wide basis"). Defendants rely on *Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307 (S.D.N.Y. 2003), but that case is distinguishable. *Spann* denied class certification because the putative class members had executed "a variety of severance, separation, and settlement agreements . . . containing general releases of employment claims," which were agreed to "under different circumstances" and included language that "differ[ed] among the agreements." *Id.* at 314. Some of the putative class members had signed releases in connection with an election to receive lump-sum pension benefits in circumstances that "var[ied] widely," including some involving settlements with legal representation. *Id.* By contrast, the releases at issue here all contain similar carve-outs for "any rights or benefits that vested . . . prior to your execution of this agreement under any employee benefit plans governed by ERISA." Dkt. 152-1 at 1. Moreover, the individualized question of whether the releases were "knowning and voluntary" will only arise in the event that the Court determines the releases are applicable to the class claims at all. In any event, as explained above, if the Court later determines that an examination of individualized circumstances is required, the Court "may nonetheless continue with the collective action if manageable, or decertify the class at a later stage, or bifurcate the trial, as necessary, to deal with such defenses." *Sexton*, 2009 WL 1706535, at *9 (citation omitted). Defendants' third and final objection is thus overruled.

## IV.     Certification Pursuant to Rule 23(b)(1)(A)

Judge Wang found that Plaintiffs satisfied the requirements of Rule 23(b)(1)(A), (b)(2), and (b)(3). The Court concludes that class certification is appropriate pursuant to Rule 23(b)(1)(A).

Class certification under Rule 23(b)(1)(A) is proper where "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed R. Civ. P. 23(b)(1)(A). "The language of subdivision (b)(1)(A), addressing the risk of 'inconsistent adjudications,' speaks directly to ERISA suits, because the defendants have a statutory obligation, as well as a fiduciary responsibility, to 'treat the members of the class alike.'" *In re Citigroup Pension Plan ERISA Litig.*, 241 F.R.D. 172, 179 (S.D.N.Y. 2006) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). Accordingly, "[m]ost ERISA class action cases are certified under Rule 23(b)(1)." *Caufield v. Colgate-Palmolive Co.*, 2017 WL 3206339, at *6 (S.D.N.Y. July 27, 2017).

Plaintiffs challenge the assumptions that Defendants used to calculate each class member's benefits under the Plan. Defendants, for their part, assert that the Plan provides "that (1) all optional forms be calculated from the Accrued Benefit and (2) all optional payment forms be actuarially equivalent when the assumptions are applied on a consistent basis." Abraham Report ¶ 7. Thus, the validity of the assumptions Defendants used in calculating the benefits offered under the Plan—as well as whether another set of assumptions is proper—are issues that apply to the class as a whole. As another judge in this district explained in certifying an ERISA class pursuant to Rule 23(b)(1)(A), if "two courts came to different conclusions as to how the proposed class members' [Plan] benefits must be calculated, Defendants would face a conflict between treating Plan participants alike and complying with each separate court order." *Caufield*, 2017 WL

17

3206339, at *6. Because prosecuting separate actions here could similarly result in conflicting determinations as to how participants' benefits should be calculated, the Court agrees with Judge Wang's conclusion that the class may be certified under Rule 23(b)(1)(A).

## CONCLUSION

For the foregoing reasons, the Court accepts and adopts Judge Wang's March 17, 2023 Report and Recommendation. Plaintiffs shall proceed on a class-action basis pursuant to Federal Rule of Civil Procedure 23(b)(1)(A). The class shall be defined as follows:

> All participants (and their beneficiaries) that began receiving pension benefits (1) on or after January 1, 2013, (2) in the form of a joint and survivor annuity with a survivorship percentage between 50% and 100%, (3) whose benefit was calculated entirely using the Traditional Part's formula, and (4) not calculated under Section 4.02-A or 5.02-A of the Plan as of June 30, 2008. Excluded from the Class are Defendants and any individuals who are subsequently to be determined to be fiduciaries of the Plan.

The class will be divided into two subclasses, with one subclass to consist of class members who signed a release upon their separation from MetLife. Plaintiffs Kernan, Ross and Brownell are appointed class representatives and Izard, Kindall & Raabe, LLP ("IKR") and Bailey & Glasser LLP ("B&G") are appointed class counsel. No later than October 6, 2023, the parties shall submit a joint letter proposing next steps in this matter.

The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 140.

SO ORDERED.

Dated:    September 7, 2023
          New York, New York

_____
Ronnie Abrams
United States District Judge