UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM MASTEN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY, et al.,<br><br>Defendants. | 18 Civ. 11229 (DEH)<br><br>**OPINION<br>AND ORDER** |

DALE E. HO, United States District Judge:

Plaintiffs bring this class action against Defendants Metropolitan Life Insurance Company, the Metropolitan Life Insurance Company Employee Benefits Committee, and MetLife Group, Inc. ("Defendants" or "MetLife"), alleging that the qualified joint and survivor annuity ("QJSA") benefits that they are receiving under their MetLife retirement plan violate the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 ("ERISA"). Before the Court is Defendants' motion for summary judgment seeking to dismiss all claims. *See* ECF No. 185. For the reasons that follow, that motion is **DENIED**.

## BACKGROUND

### A. ERISA Statutory Scheme

Before discussing the factual background, the Court reviews the statutory framework in which the issues arise.

ERISA was enacted to protect "the interests of participants in employee benefit plans and their beneficiaries, . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b). "Employers do not have to provide

pension plans, but when they do, those plans must comply with Title I of ERISA . . . and [employers and employees] cannot contract around the statute." *Esden v. Bank of Bos.*, 229 F.3d 154, 172-73 (2d Cir. 2000). ERISA authorizes private rights of action brought by participants or beneficiaries to "(A) enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

One of the statutory protections that plans cannot contract around is ERISA § 205(d) ("section 205"),[1] "the object of which is to ensure a stream of income to surviving spouses" of plan participants. *Boggs v. Boggs*, 520 U.S. 833 (1997).[2] This provision requires that the default form of benefit for married participants be a "qualified joint and survivor annuity" ("QJSA"), which is a payment stream for the lives of both a participant and a surviving spouse. 29 U.S.C. §§ 1055(a)(1), (d)(1). ERISA further provides that a QJSA must be "the actuarial equivalent of a single annuity for the life of the participant." *Id.* § 1055(d)(1)(B). Likewise, if a participant elects to waive a QJSA, plans must offer a qualified optional survivor annuity ("QOSA"), which must also be "the actuarial equivalent of a single annuity for the life of the participant." *Id.* §§ 1055(c)(1)(A)(ii), (d)(2)(A)(ii).

ERISA "does not define 'actuarial equivalent,'" though the D.C. Circuit has explained that "'two modes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions.'" *Masten v. Metro. Life Ins. Co.*, 543 F. Supp. 3d 25, 29, 34

---

[1] ERISA § 205 is codified at 29 U.S.C. § 1055. ERISA § 502 is codified at 29 U.S.C. § 1132.

[2] In all quotations from cases, the Court omits citations, footnotes, emphases, internal quotation marks, brackets, and ellipses, unless otherwise indicated. All references to Rules are to the Federal Rules of Civil Procedure.

(S.D.N.Y. 2021) ("*Masten I*") (quoting *Stephens v. U.S. Airways Grp., Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011)).  Implementing regulations promulgated by the United States Department of Treasury ("Treasury") provide that "[e]quivalence may be determined[] on the basis of consistently applied reasonable actuarial factors, for each participant or for all participants or reasonable groupings of participants[.]"  26 C.F.R. § 1.401(a)-11(b)(2).  And in a previous decision in this case, the Court held "that ERISA requires that Plan administrators use reasonable actuarial assumptions . . . ."  *Masten I*, 543 F. Supp. 3d at 34-35.

While ERISA requires that the QJSA be actuarially equivalent to a single annuity for the life of the participant, it does not require that it be actuarially equivalent to all other benefit options.  *See Retirement Comm. of DAK Americas LLC v. Brewer*, 867 F.3d 471, 482-83 (4th Cir. 2017) ("A plan may have more than one optional form of benefit under which benefits may be paid.  There is no requirement that each form of benefit be the actuarial equivalent of all other benefit forms."); *cf.* 26 C.F.R. § 1.401(a)-11(b)(2) ("A [QJSA] must be at least the actuarial equivalent of the normal form of life annuity or, *if greater*, of any optional form of life annuity offered under the plan.") (emphasis added).

## B.  Factual Background

The facts of this case are detailed, among elsewhere, in the Court's opinions in *Masten I*, 543 F. Supp. 3d at 29-31, and in *McAlister v. Metro. Life Ins. Co.*, No. 18 Civ. 11229, 2023 WL 5769491, at *2 (S.D.N.Y. Sept. 7, 2023).  The Court therefore recites only those facts that are necessary to resolving this motion.  These facts are drawn from the Second Amended Complaint ("SAC"), ECF No. 124; Defendants' Statement of Undisputed Material Facts ("SUMF"), ECF No. 187; Plaintiffs' Response and Counterstatement of Undisputed Material Facts ("CUMF"), ECF No. 189; and evidentiary submissions in connection with Defendants' motion.  The facts are either undisputed or, if disputed, resolved in the light most favorable to Plaintiffs as the non-

moving party, with all reasonable inferences drawn in their favor. *See Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023).

### 1. The Plan

Plaintiffs are retired MetLife employees who accrued retirement benefits under a defined benefit plan governed by ERISA ("the Plan"). SUMF ¶ 1; SAC ¶¶ 13-19. Among other things, Plaintiffs allege that "[t]he Plan improperly reduces annuity benefits for [Plan] participants and beneficiaries . . . who receive QJSAs and QOSAs below the amounts that they would receive if those benefits satisfied ERISA's actuarial equivalence requirements." SAC ¶ 106. The Plan defines a QJSA as a joint and survivor annuity between 50% and 100%. CUMF ¶ 9.

The Plan contains several different formulas for calculating benefits. SUMF ¶ 2. The formula relevant here is the "Traditional Formula." *Id.* ¶ 3. The accrued benefit for most participants in Plaintiffs' class under the Traditional Formula is in the form of a 12-Year Certain and Life Annuity ("12YCLA"), which is an annuity for the life of the participant that includes a guarantee of twelve years of payments for the survivor if the participant dies sooner. *Id.* ¶ 5. The Plan also provides various other forms of benefits, including a single life annuity ("SLA")—in which "a pensioner receives a defined-benefit payment for the duration of her own life," *Masten I*, 543 F. Supp. 3d at 29—other forms of Certain and Life Annuities ("CLAs"), and various forms of joint and survivor annuities ("JSAs"). *Id.* ¶ 6; CUMF ¶ 11. The Plan defines the SLA as an annuity where "'monthly payments are made to the Participant or Former Participant up to the date of the last payment due before the Participant's or Former Participant's death.'" CUMF ¶ 12 (quoting ECF No. 47-1).

The amount of monthly benefit in the form of a JSA is calculated by applying a "conversion factor" to the participant's accrued benefit, the purpose of which is to ensure that the two benefits have the same present value. SUMF ¶¶ 8-9; SAC ¶ 2. The conversion factor is

based on actuarial assumptions set forth in the Plan concerning mortality rates (as these affect how long payments are likely to be made under each optional form of benefit), and interest rates used to discount future payments to present value. *See* SUMF ¶ 9; SAC ¶ 2. The Plan contains several different sets of assumptions, formulas, and conversion factors, each of which is applicable to a different group of participants. *See* SUMF ¶ 2; CUMF ¶¶ 3-8. Some conversion factors under the Plan do not list the actuarial assumptions underlying those factors. CUMF ¶ 8.

The crux of Plaintiffs' class claim is that "[b]ecause the Plan used old mortality tables, MetLife caused Plaintiffs and Class Members to receive benefits that violate ERISA's actuarial equivalence rules[.]" SAC ¶ 8. As a result, Plaintiffs and Class Members unknowingly forfeited and lost part of their vested benefits, in violation of ERISA's anti-forfeiture rule. *Id.* (citing 29 U.S.C. §§ 1055(d), 1053(a)). Stated differently, by "using outdated mortality assumptions, Defendants did not provide Plaintiffs with JSA benefits that are actuarially equivalent and [they thereby] reduced the present value of Plaintiffs' benefits," causing "Plaintiffs and other participants and beneficiaries of the Plan to receive less than they should as a pension every month[.]" *Id.*; *see also* CUMF ¶¶ 19-21 (describing the mortality tables used and stating that the conversion factors employed were unreasonable). "Accordingly, Plaintiffs seek an Order from the Court reforming the Plan to conform to ERISA," as well as "payment of future benefits in accordance with the reformed Plan," "payment of amounts improperly withheld, and such other relief as the Court determines to be just and equitable." SAC ¶ 9.

### 2. Plaintiff Catherine McAlister's Release

On December 29, 2014, Plaintiff Catherine McAlister ("McAlister") signed a release agreement ("Release") after her unemployment concluded, as a condition for receiving severance benefits. SUMF ¶ 10; CUMF ¶ 1; *see generally* Release, ECF No. 152-5. Pursuant to the terms

of the Release, McAlister released all entities related to the MetLife affiliate with whom she had

been employed, including the Defendants in this case,

> from any and all claims, charges, demands, actions, liability, damages, sums of
> money, back pay, attorneys' fees, or rights of any and every kind or nature which
> you ever had, now have or may have, whether known or unknown, against the
> Company arising out of any act, omission, transaction, or occurrence up to and
> including the date you execute this Agreement including, but not limited to, . . . any
> alleged violation of, any federal, state, or local fair employment practice or benefits
> laws . . . .

Release ¶ 1.  The Release contains a limitation on its scope (the "Carve Out"), which states:

> This Agreement does not affect any rights that you may have arising out of events
> that occur after you have executed this Agreement or affect any benefits or rights
> that vested prior to your execution of this Agreement under employee benefit plans
> governed by ERISA.

*Id.*  Before signing the Release, McAlister received a pension election kit that set forth the

amount of each of the benefit options that were available to her.  SUMF ¶¶ 10-11.  The day after

signing the Release, on December 30, 2014, McAlister received her benefit pension election

form, elected a "100% Contingent Survivor Annuity" as her Traditional Plan pension benefit,

and signed her form.  *See* CUMF ¶ 2; *see also* Izard Decl. 4, ECF No. 191-1.

### C. Procedural History

Plaintiffs commenced this action on December 3, 2018, and amended their pleadings on

March 26, 2019.  *See* ECF Nos. 1, 42.  On April 18, 2019, Defendants filed a motion to dismiss

the First Amended Complaint ("FAC"), which was fully briefed on June 13, 2019.  *See* ECF

Nos. 45, 46, 52.  On June 14, 2021, the Court denied Defendants' motion to dismiss.  *See* ECF

No. 112.  As relevant here, it held as follows:

> Plaintiffs allege, and the Court can reasonably infer, that the use of older mortality
> tables produces a lower benefit payment.  As a result, the allegation that Plaintiffs'
> joint-and-survivor benefits are not actuarially equivalent to an SLA adequately
> pleads injury regardless of the Plan's starting point for benefit calculation.
>
> . . .

> The Court [further] finds that Plaintiffs have plausibly alleged the Plan's use of []
> mortality tables [from 1971 and 1983] is unreasonable in th[e] context [described
> by Plaintiffs' pleadings]. As a result, [Plaintiffs] have adequately pled a violation
> of ERISA Section 205, 29 U.S.C. § 1055.

*Masten I*, 543 F. Supp. 3d at 33, 36.

After the Court denied Defendants' motion to dismiss the FAC, Plaintiffs filed the SAC,

the operative pleading, on October 21, 2021.  *See* ECF No. 124.  The parties engaged in expert

class discovery, and on March 3, 2022, Plaintiffs moved to certify a class (ECF No. 140)

consisting of all participants and their beneficiaries who began receiving pension benefits:

> (1) on or after January 1, 2013;
> (2) in the form of a joint and survivor annuity with a survivorship percentage
> between 50% and 100%;
> (3) whose benefit was calculated entirely using the Traditional Part's formula; and
> (4) not calculated under Section 4.02-A or 5.02-A of the Plan as of June 30, 2008.

*McAlister*, 2023 WL 5769491, at *2 (citing ECF No. 141).  On March 17, 2023, Magistrate

Judge Wang issued a Report recommending that the Court certify the proposed class and divide

it into two subclasses.  *See* ECF No. 161 at 17.  Defendants filed an objection to the Report on

April 28, 2023, and Plaintiffs responded on June 2, 2023.  *See* ECF Nos. 165, 166.  On *de novo*

review and following oral argument, *see* ECF No. 170, the Court accepted and adopted Judge

Wang's Report on September 7, 2023.  *See* ECF No. 172.  As relevant here, it noted as follows:

> Defendants may ultimately be correct that the Plan's scheme of deriving both the
> SLA and the JSA from the CLA renders Plaintiffs' methodology inapt.  Indeed,
> there is some logic to Defendants' argument, given that Plaintiffs' methodology
> compares an SLA calculated using outdated mortality assumptions with a JSA
> calculated using more recent assumptions. . .  If Defendants are correct that
> Plaintiffs' assumptions must be applied consistently, and the result is—as
> Defendants urge—that "the [JSA] and SLA benefits will be actuarially equivalent
> to each other," Dkt. 150, Opp. to Class Certification at 25, then they will have
> effectively defeated Plaintiffs' theory of the case *on the merits*: namely, that the
> Plan "did not provide Plaintiffs with JSA benefits that are actuarially equivalent."

*McAlister*, 2023 WL 5769491, at *4.[3]

"Defendants now renew their challenge to Plaintiffs' methodology for establishing class liability and damages, this time as a basis for moving for summary judgment on the merits of Plaintiffs' claim." Mem. of L. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Br.") 2, ECF No. 186. "In the alternative, Defendants move for summary judgment on the claim of more than 1,000 class members who elected a JSA other than a 50% or 75% JSA." *Id.* Defendants' motion for summary judgment is now fully briefed before the Court. *See* ECF Nos. 185, 190, 192.

## LEGAL STANDARDS

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Rupp v. Buffalo*, 91 F.4th 623, 634 (2nd Cir. 2024); *see also* Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "'might affect the outcome of the suit under the governing law.'" *Id.* at 682 (quoting *Anderson*, 477 U.S. at 248). A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of N.Y.*, 874 F.3d 338, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Hincapie v. City of New York*, No. 18 Civ.

---

[3] The case was reassigned to the undersigned on October 17, 2023. *See* Oct. 17, 2023, Min. Entry.

3432, 2022 WL 2870411, at *7 (S.D.N.Y. July 21, 2022) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)).

**DISCUSSION**

For the reasons discussed herein, the Court denies Defendants' motion for summary judgment and reserves for trial many of the issues raised.

**A. Plaintiffs' Methodology**

Defendants raise various objections to Plaintiffs' expert's methodology for assessing whether the QJSAs and QOSAs are actuarially equivalent to "a single annuity for the life of the participant." 29 U.S.C. § 1055(d). The Court considers each in turn below.

**1. 12YCLA**

First, the parties dispute whether the 12-Year Certain and Life Annuity ("12YCLA")—an annuity that includes a guarantee of twelve years of payments, but is otherwise for the life of the participant if the participant lives longer—is properly viewed as "a single life annuity within the meaning of ERISA section 205," such that it is an appropriate comparator to the Plan's QJSA under ERISA. *See* Defs.' Opp'n to Pls.' Notice of New Evid. 1, ECF No. 194; *see also* Pls.' Notice of New Evid. ("Pls.' Notice") 1-2, ECF No. 193. The 12YCLA is an alternative to the standard SLA under the Plan. Under the Plan's terms, participants who choose an SLA "receive an adjusted monthly income for life," with "[n]o further payments [] made to anyone after [the participants' death]." ECF No. 47-2 at 11. For participants who choose a 12YCLA, "the monthly payment [is] reduced," but, as noted, survivors are guaranteed to receive twelve years of payments in the event the participant dies sooner than that. *See id.*

Plaintiffs argue that the 12YCLA is not "an annuity for the life of the participant" within the meaning of section 205, and that the appropriate comparator under section 205 for the Plan's QJSA and QOSA is the SLA. *See* Pls.' Notice 2; *see also* Pls.' Opp'n to Defs.' Mot. for Summ.

9

J. ("Pls.' Opp'n") 4-8, ECF No. 190.  Plaintiffs' case-in-chief rests on a methodology that compares the Plan's QJSA and QOSA to its SLA, and which purports to show that they are not actuarially equivalent to the SLA.  *See* Pls.' Opp'n 1.  For their part, Defendants argue that the 12YCLA qualifies as "an annuity for the life of the participant" under section 205.  *See* Defs.' Br. 11.  If that is correct, then, Defendants further argue that Plaintiffs' claim fails as a matter of law, because the Plan's QJSA and QOSA are (at least pursuant to Defendants' methodology) actuarially equivalent to the 12YCLA—which, as noted, entails a lower monthly payment than the standard SLA.

As relevant here, section 205(d) holds as follows:

> (1) For purposes of this section, the term [QJSA] means an annuity . . . (B) which is the actuarial equivalent of a single annuity *for the life of the participant*. [Likewise,] the term [QOSA] means an annuity . . . (ii) which is the actuarial equivalent of a single annuity *for the life of the participant*.

29 U.S.C. § 1055(d) (emphases added).

According to Defendants, "section 205(d)'s reference to a 'single annuity for the life of a participant'" does not refer to a particular SLA, but rather "contemplates a more generic form of single life annuity" which may feature what Defendants label "ancillary benefits," such as a guarantee of a minimum number of certain years of benefits—like the 12YCLA's guarantee of a twelve-year term.  Defs.' Br. 12.  As such, Defendants contend that, because "Plaintiffs have not proffered any evidence that the JSAs they receive are not actuarially equivalent to the 12YCLA they were offered by the Plan," Plaintiffs' "section 205(d) claim [] fails as a matter of law."  *See id.*

The Court disagrees with Defendants' interpretation of the statute's requirements.  It is undisputed that the 12YCLA is "a single life annuity *with a twelve-year term certain*."  CUMF ¶ 13 (citing ECF 47-1 at § 1.01(d)) (emphasis added).  In other words, the 12YCLA is a certain

guarantee of at least twelve years, which extends longer if the participant lives beyond that duration. *See id.* ¶ 14 (citing ECF 151-1 § 31). But by its plain terms, section 205(d) requires comparison specifically to "a single annuity for the life of the participant." *See Masten I*, 543 F. Supp. 3d at 29 ("In a single life annuity (or 'SLA'), a pensioner receives a defined-benefit payment *for the duration of her own life*.") (emphasis added); *see also Kowal v. Hooker & Holcombe, Inc.*, No. 21 Civ. 1299, 2024 WL 1094959, at *2 n.3 (W.D.N.Y. Mar. 13, 2024) (noting that an SLA is "an annuity payable . . . for the life of the participant that terminates upon the participant's death," while a fixed-term annuity is "for a fixed number of years"). Section 205(d) does not, for example, permit an actuarial comparison to an annuity that is for "at least" the life of the participant, or to a "generic form of" single life annuity, as Defendants would have it. The Court is not free to read in text that is not present in the statute. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 228 (2008) ("We are not at liberty to rewrite the statute to reflect a meaning we deem more desirable."). Because the 12YCLA has a guaranteed payment period of at least 12 years (at a lower monthly payment than the standard SLA), it is not an annuity "for the life of the participant" under section 205, as is required for comparison purposes by ERISA. *See* 29 U.S.C. § 1055(d).

Defendants nonetheless assert that because a separate provision, ERISA § 204, refers to a single life annuity *without* ancillary benefits, a single life annuity *with* "ancillary benefits must be covered by section 205. *See* Defs.' Br. 11-12 (invoking the negative inference principle of statutory construction). According to Defendants, the 12YCLA is just such an annuity—it is for life, with an ancillary benefit of a twelve-year term certain. But by definition, an optional benefit like the 12YCLA cannot be an "ancillary benefit" as that term is defined under the relevant regulations. An "ancillary benefit" is defined as "a death benefit under a defined benefit plan *other than a death benefit which is a part of an optional form of benefit*." 26 C.F.R. § 1.411(d)-

3(g)(2)(v) (emphasis added). But the 12YCLA is "one of several optional forms of benefits offered by the Plan." SUMF ¶ 6; CUMF ¶ 11. Assuming *arguendo* that the 12YCLA is a death benefit, the 12YCLA offered under the Plan, as an *optional* benefit, cannot be said to be an "ancillary benefit." Thus, even if Defendants were correct that section 205 includes SLAs with "ancillary benefits," it still would not cover the 12YCLA.

Finally, the Court declines Defendants' invitation to hold that Plaintiffs' methodology—which, as discussed *supra*, applied section 205(d)'s plain terms by comparing the Plan's QJSA and QOSA to its SLA—was either incorrect or inconclusive. At most, there remains "a genuine dispute whether the JSAs were 'equivalent' to SLAs in the manner that ERISA requires." *Urlaub v. CITGO Petrol. Corp.*, No. 21 Civ. 4133, 2024 WL 2019958, at *9 (N.D. Ill. May 6, 2024) (denying in part the defendants' motion for summary judgment, given the genuine dispute).[4] Accordingly, the Court denies Defendants' motion for summary judgment as to this claim.

### 2. Actuarial Factors

Defendants alternatively argue that "[e]ven if a showing of non-actuarial equivalence between Plaintiffs' JSAs and the SLAs offered by the Plan could support a section 205(d) claim, Plaintiffs' methodology for demonstrating such non-equivalence would still be erroneous," because Plaintiffs' expert "left the Plan's assumptions in place for purposes of calculating the SLAs" while at the same time using "his preferred assumptions only for purposes of recalculating the JSAs." *See* Defs.' Br. 13. According to Defendants, this was in error because "equivalence" must be assessed "on the basis of consistently applied reasonable actuarial

---

[4] Even if Defendants' interpretation of the statute were correct, the Court notes that Plaintiffs have proffered evidence that the QJSA is not actuarially equivalent to the 12YCLA, thereby raising a question of fact and providing alternative grounds for dismissing Defendants' motion for summary judgment. *See* Pls.' Opp'n 7-8; CUMF ¶¶ 18-21.

factors." *See id.* (quoting 26 C.F.R. § 1.401(a)-11(b)(2)).  Plaintiffs counter that their expert "directly addressed whether the JSA offered by the Plan was not actuarially equivalent to the SLA offered by the same Plan," by applying assumptions that were legal under ERISA.  Pls.' Opp'n 10.

Defendants fail to convince the Court that Plaintiffs' methodology was erroneous as a matter of law.  The Court is not aware of, and Defendants do not cite, any caselaw stating that Plaintiffs' expert was required to use the same factors to compare SLAs to CLAs or other optional forms of benefits under the Plan.  And Defendants have not established that Plaintiffs inconsistently applied actuarial factors in comparing the JSA to the SLA offered by the Plan. *See Urlaub*, 2022 WL 523129, at *1 (stating that ERISA requires actuarial equivalence between the JSA and the SLA the participant could have selected under the plan).  The Court therefore declines to conclude that Plaintiffs' expert's methodology was erroneous as a matter of law.

Defendants' expert also argued that Plaintiffs' expert should have compared the 12YCLA to the QJSA, *see* CUMF ¶ 25, but the Court has addressed that argument.  *See supra*.  He further "argued that [Plaintiffs' expert's] calculations [erroneously] partially retain the Plan's out of date assumptions." *Id.* ¶ 26.  Once again, the Court notes that "Defendants may ultimately be correct that . . . Plaintiffs' methodology [is] inapt." *McAlister*, 2023 WL 5769491, at *4.  But "when there are dueling experts, both of whom have put forward opinions in contradiction with each other, and when those opinions are important to resolution of a material factual dispute, summary judgment may not be appropriate." *Realtime Data, LLC v. Stanley*, 897 F. Supp. 2d 146, 153 (S.D.N.Y. 2012)).  The Court leaves the determination of which expert's position is more persuasive here for trial.  *See BS BIG V, LLC v. Phila. Indem. Ins. Co.*, No. 19 Civ. 4273, 2022 WL 4181823, at *6 (S.D.N.Y. Sept. 13, 2022) (holding that assessments that "involve a fact-

intensive analysis of, among other things, the credibility of both experts and the information . . .

upon which they relied" are inappropriately resolved at summary judgment).

### B. Plan Reformation

Defendants argue that Plaintiffs abandoned their Second Claim for Relief (for

reformation of the Plan and recovery of benefits under the reformed Plan under ERISA §

502(a)(3), *see* SAC ¶¶ 110-115) "because their expert nowhere purports to calculate alleged

damages under a Plan that is reformed to replace its allegedly unreasonable assumptions." Defs.'

Br. 15.  In essence, Defendants argue that because Plaintiffs' expert used a methodology for

calculating benefits with which Defendants disagree, Plaintiffs have abandoned their reformation

claim.  The Court is aware of no caselaw—and Defendants cite none—supporting this

abandonment claim.  Instead, "[f]ederal courts may deem a claim abandoned when a party

opposing summary judgment fails to address the [movant's] argument in any way." *Collins v.*

*City of New York*, 295 F. Supp. 3d 350, 361 (S.D.N.Y. 2018).  That is not the case here, where

Plaintiffs directly address it.  *See* Pls.' Opp'n 12-17.  At any rate, the Court has already found

that "Plaintiffs here have proposed one model, which, if applied according to their methodology,

would result in a[] [reformed plan that] increase[s] [] benefits for all the class members."

*McAlister*, 2023 WL 5769491, at *6 (citing Altman Report § 18).

Defendants argue in the alternative that adoption of any reformed plan pursuant to

Plaintiffs' proposed methodology would cause the Plan to violate ERISA.  *See* Defs.' Br. 16.

Plaintiffs, unsurprisingly, argue the opposite.  *See* Pls.' Opp'n 16.  As discussed *supra*, the Court

declines to hold Plaintiffs' methodology erroneous as a matter of law, and it declines at this stage

to weigh in on any battle of the experts.  *See In re Jackson*, 653 B.R. 1, 32-33 (D. Conn. 2023)

("A court may not assess the weight of an expert's opinion, as doing so is straying from its role

of gatekeeper.") (citing *Richardson v. Corr. Med. Care, Inc.*, 2023 WL 3490904, at *3 (2d Cir.

2023)), *appeal withdrawn*, No. 23 Civ. 1089, 2023 WL 9380794 (2d Cir. Aug. 18, 2023).  It therefore declines at this stage to hold that any reformed Plan using Plaintiffs' expert's methodology would violate ERISA—a matter it instead leaves for resolution at trial.

### C. Other Equitable Relief

Plaintiffs seek equitable relief on the first two claims in the SAC.  First, under ERISA § 502(a)(3), Plaintiffs seek "a broad range of remedies, including re-calculation, correction, and payment of benefits; an accounting; surcharge; disgorgement of amounts wrongfully withheld, and profits earned thereon; a constructive trust; an equitable lien; and an injunction."  Pls.' Opp. 15 (citing SAC ¶ 109).  With respect to this claim, Defendants argue that the equitable relief sought by Plaintiffs is "invalid as a matter of law" because, *inter alia*, the "monetary relief" sought by Plaintiffs "is not within the scope of ERISA section 502(a)(3) because of its compensatory [i.e., non-equitable] nature."  Defs.' Br. 14, 16.

The relevant provision states as follows:

> A civil action may be brought [under ERISA] . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to *obtain other appropriate equitable relief* (I) *to redress such violations* or (II) to enforce any provisions of this subchapter or the terms of the plan[.]

29 U.S.C. § 1132(a)(3) (emphasis added).

"As the Supreme Court has explained, 'equitable relief in § 502(a)(3) is limited to those categories of relief that were typically available in equity during the days of the divided bench.'" *Trs. of N.Y. State Nurses Ass'n Pension Plan v. White Oak Glob. Advisors, LLC*, 102 F.4th 572, 602 (2d Cir. 2024) (citing *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 142 (2016)).  As Defendants note, to the extent Plaintiffs seek "monetary compensation resembling legal damages" (as opposed to plan reformation), that remedy is "unavailable as an equitable remedy under § 502(a)(3)," unless Plaintiffs have alleged a breach

of fiduciary duty or an unjust enrichment against a fiduciary. *See* Defs.' Br. 16 (citing *N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 135 (2d Cir. 2015)); *see also Sullivan-Mestecky v. Verizon Commc'ns Inc.*, 961 F.3d 91, 102-03 (2d Cir. 2020) (holding that plaintiff's "§ 502(a)(3) claim is dependent on her allegation of fiduciary breach").

Plaintiffs expressly dismissed with prejudice their claim for breach of fiduciary duty, *see* ECF No. 182 at 2 ¶ 1, but they also implicitly raised an unjust enrichment claim, *see* Pls.' Opp'n 14. An unjust enrichment claim arises where "circumstances create an equitable obligation running from the defendant to the plaintiff, such as when the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 430 (S.D.N.Y. 2021), *aff'd sub nom. Tapinekis v. Pace Univ.*, No. 22 Civ. 1058, 2024 WL 2764146 (2d Cir. May 30, 2024). Here, Plaintiffs have argued that Defendants were unjustly enriched under the existing benefit scheme because they paid Plaintiffs benefits that were lower than the amount required by ERISA. *See generally* SAC. Drawing all reasonable inferences in Plaintiffs' favor, the Court determines that Plaintiffs plausibly raise an unjust enrichment claim. *See In re DeRogatis*, 904 F.3d 174, 199-200 (2d Cir. 2018) (stating that under section 502(a)(3), plaintiffs may seek remedies such as monetary surcharge to "to recompense a loss resulting from a fiduciary's breach of duty, *or to prevent the fiduciary's unjust enrichment*") (emphasis added). Plaintiffs contend that, on this claim, the Court could order various equitable remedies such as "an injunction ordering a re-calculation, correction, and payment of benefits that are owed under ERISA without reforming the Plan; it could order a surcharge in the amount by which benefits were too low; or it could order Defendants to disgorge the amount by which participants and beneficiaries were short changed." Pls.' Opp. 15. It is premature at this time for the Court to decide whether any particular remedies

are in fact appropriate should the Plaintiffs establish liability, and, accordingly, the Court reserves that determination for trial.

With respect to Plaintiffs' second claim seeking equitable relief, for plan reformation under ERISA § 502(a)(3) and recovery of benefits under the reformed plan under ERISA § 502(a)(1), as discussed *supra*, Plaintiffs have not abandoned that claim. When a plan "is reformed according to the district court's order, monetary benefits flow as a necessary consequence of that injunction." *Amara v. CIGNA Corp.*, 775 F.3d 510, 523 (2d Cir. 2014). Reformation was "typically available in equity." *Amara v. CIGNA Corp.*, 925 F. Supp. 2d 242, 250 (D. Conn. 2012), *aff'd*, 775 F.3d 510 (2d Cir. 2014). Accordingly, to the extent Plaintiffs seek to reform the Plan and receive payment of benefits that they believe they are owed under ERISA, that request for equitable relief also survives.

For the above-stated reasons, Defendants' motion for summary judgment is denied as to these claims.

### D. Participants with other than a 50% or 75% JSA

Defendants argue that the default QJSA is the only available QJSA under the Plan, and that the sole QOSA is the 75% JSA. *See* Defs.' Br. 18; *see also* Defs.' Reply in Further Supp. of Mot. for Summ. J. ("Defs.' Reply") 7-8, ECF No. 192. Accordingly, Defendants contend that the over 1,000 class members with a JSA other than a 50% or 75% JSA do not have standing to bring a section 205(d) claim, as those participants have not elected a QJSA or QOSA. *See* Defs.' Br. 17-18. The Court disagrees with this alternative argument.

"A plan can always provide for more than one annuity which meets the requirements of a QJSA," and "[a] participant is always free to choose *among QJSAs* available under the plan at any time and without the need for spousal consent, provided the annuities are actuarially equivalent." IRS Publication 6391 (rev. 4-2016) Explanation No. 3 Joint and Survivor

17

Determination of Qualification, 2016 WL 6085988, at *6 (emphasis added).[5] "[W]here a plan does offer two or more actuarially equivalent joint and survivor annuities that meet the requirements of a QJSA, it must designate which one will be the automatic form of benefit." *Id.*

Here, the Plan appears to define the QJSA as any JSA between 50% and 100%, with 50% being designated as the default. CUMF ¶ 9; SUMF ¶ 7; Defs.' Br. 18.[6] Defendants contend that only one JSA can be construed as either the QJSA or QOSA because "section 205(d) evinces an intent to protect only one QJSA and one QOSA" at any given time. *See* Defs.' Reply 8. But section 205(d) provides that the QJSA is defined as "an annuity" "for the life of the participant with a survivor annuity for the life of the spouse which is not less than 50 percent of (and is not greater than 100 percent of) the amount of the annuity which is payable during the joint lives of the participant and the spouse[.]" 29 U.S.C. § 1055(d)(1)(A). It does not state that ERISA protects only those individuals who elect a designated default or automatic form of JSA benefit under a plan. And it does not prevent a plan from offering additional QJSAs that a participant can select, as the Plan appears to have done here. *See* CUMF ¶ 9.

That a plan must designate one option as the default does not change the fact that a plan can have more than one QJSA. *See Soon v. PNM Res., Inc. Emps.' Ret. Plan*, No. 4 Civ. 676, 2005 WL 8164217, at *1 (D.N.M. May 27, 2005) ("Defendants' Plan provide[d] *three QJSA options*: 50%, 66-2/3% and 100%.") (emphasis added). If Defendants' narrow interpretation of the statute were correct, then a participant who elects a plan other than the default benefit option

---

[5] "The IRS has primary jurisdiction and rule-making authority over ERISA's funding, participation, benefit accrual, and vesting provisions." *Laurent v. PricewaterhouseCoopers LLP*, 794 F.3d 272, 287 (2d Cir. 2015).

[6] Defendants argue in a footnote that this is a disputed fact, as the part of the Plan that so-defines the QJSA does not apply to members of the certified class. *See* Defs.' Reply 7 n.7. The Court determines that this is a factual dispute best left for resolution at trial.

would be at risk of losing ERISA protections. The Court declines to adopt that interpretation, which would frustrate ERISA's goal of "protect[ing] beneficiaries of employee benefits plans." *Gedek v. Perez*, 66 F. Supp. 3d 368, 373 (W.D.N.Y. 2014); *see also Gordon v. Softech Int'l, Inc.*, 726 F.3d 42, 51 (2d Cir. 2013), *as corrected* (Aug. 1, 2013) ("[Courts] will not interpret a statute in a way that apparently frustrates the statute's goals, in the absence of a specific congressional intention otherwise."). Accordingly, it denies Defendants' motion as to this claim.

### E. McAlister's Claim

Defendants' final argument is that McAlister's individual claim should be dismissed according to the terms of her Release and because the Carve-Out provision in that Release does not apply. *See* Defs.' Br. 18-22. The Court again disagrees.

McAlister's Release waives "any and all claims" against Defendants for, *inter alia*, alleged violations of federal "benefits laws" "arising out of any act, omission, transaction, or occurrence up to and including the date [on which McAlister] execute[d] th[e] Agreement," i.e., December 29, 2014. Defs.' Br. 5, 18; SUMF ¶ 10 (citing ECF Nos. 154-4, 152-5); CUMF ¶ 1. The Release's Carve-Out excludes from the Release (1) "rights that [McAlister] may have *arising out of* events that occur after" December 29, 2014, and (2) "benefits or rights that vested . . . under employee benefit plans governed by ERISA" before December 29, 2014. Defs.' Br. 5, 20; SUMF ¶ 10 (citing ECF Nos. 154-4, 152-5) (emphasis added). When McAlister signed the Release on December 29, 2014, she had already terminated her employment and received a pension election kit that calculated the amount of each of her benefit options, based on the Plan's assumptions. SUMF ¶¶ 10-11. The day after McAlister signed the Release, on December 30, 2014, she received and signed her benefit election form, selecting the "100% Contingent Survivor Annuity" as her Traditional Plan pension benefit. *See* CUMF ¶ 2.

The parties primarily dispute when McAlister's ERISA claims arose.  Plaintiffs argue that McAlister's claims arose out of her selection of a QJSA, which occurred after the date on which she signed the Release (and therefore would not be covered by the Release).  *See* Pls.' Opp'n 20-21.  Defendants counter that McAlister's claims arose "at the latest" "when the Plan provided her a benefit statement with an *offer* of a QJSA that allegedly failed to meet the actuarial equivalence requirement."  Defs.' Reply 9 (emphasis added).  The Court agrees with Plaintiffs.

The Agreement does not define "arising out of."  *See generally* ECF No. 152-5.[7]  In these circumstances, "[c]ourts may refer to the dictionary to determine the plain and ordinary meaning of [the disputed] contract terms."  *Dish Network Corp. v. Ace Am. Ins. Co.*, 21 F.4th 207, 211 (2d Cir. 2021).  Merriam-Webster's Dictionary defines "arise" as "to begin to occur or to exist: to come into being[.]"  *See Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/arise.  Here, McAlister's claim is for Defendants' alleged failure to adequately pay vested QJSA benefits pursuant to section 205.  Section 205 requires pension plans to provide actuarially equivalent QJSAs on the "annuity starting date," which is the "first day of the first period for which an amount is payable as an annuity[.]"  29 U.S.C. §§ 1055(a), (d), (h)(2).  Accordingly, the annuity start date was the date on which McAlister began to receive allegedly improper benefits.  On the date that McAlister signed the Release, she had not yet suffered a quantifiable injury in the form of payment of allegedly artificially low benefits; in fact, she had not yet even selected a QJSA.  *See* Defs.' Reply 9 (conceding that McAlister had only

---

[7] The parties disagree over whether caselaw providing guidance on when an ERISA claim "accrues" applies to their dispute over when McAlister's claim "arose."  See Pls.' Opp'n 20-22; Defs.' Reply 8-9.  The Court concludes it does not.  "Accrual" is a term of art, and it is nowhere mentioned by the Release.  *See generally* ECF No. 152-5.

received "an *offer* of a QJSA" at that point). The earliest point at which McAlister's claims

might be said to have "come into being" is when she selected a QJSA, because that is when she

selected the benefit plan at issue (rather than opting for a different form of benefit). Because

McAlister selected a QJSA on December 30, 2014, her claim arose out of an action that occurred

after the date of the Release and is not precluded.

Even assuming *arguendo* that the Release does extend to McAlister's ERISA claims, her

claims would nonetheless be carved out of the Release. Under the Carve-Out, the Release

expressly "does not affect any rights or benefits that vested . . . under any employee benefit plans

governed by ERISA." Defs.' Br. 5, 20; *see also* SUMF ¶ 10 (citing ECF Nos. 154-4, 152-5).

The Plan is governed by ERISA. SUMF ¶ 1. As such, the Plan must provide the vested benefits

required by ERISA, including benefits protected by section 205. McAlister's section 205 claim

is therefore carved out of the Release, as it vests under a plan governed by ERISA. Indeed,

presented with similar carve-out language, a district court in this Circuit concluded that the

carve-out provision covered claims that a plan's terms violated ERISA:

> [There is] no indication that either party, much less both, intended to draw the kind
> of fine distinctions [defendant] now argues the Court should read into the [release's
> carve-out provision]. [Defendant] points to no language, either in the waivers
> themselves or in the [relevant plans], that suggests, let alone explicitly states, that
> the [carve-out exception] covers only claims for benefits under the terms of the
> Plan, and not claims under ERISA itself.

*Amara v. Cigna Corp.*, 534 F. Supp. 2d 288, 316 (D. Conn. 2008). Like the plaintiffs in *Amara*,

McAlister seeks to protect claims under ERISA itself.

Defendants argue that McAlister does not raise a claim *under* the Plan because she seeks

relief in the form of benefits to which she would be entitled using assumptions that do not appear

in the Plan. *See* Defs.' Br. 20-22. This argument is unavailing, as Plaintiffs' (including

McAlister's) challenge to the Plan's calculation of benefits rests on an assertion of their rights

under the Plan, which is "governed by ERISA." That claim is therefore covered by the Carve-Out's clear terms. Thus, even if the Release broadly covered McAlister's claims, the Carve-Out would apply to save them. Defendants' motion for summary judgment is properly denied.

## CONCLUSION

For the reasons discussed herein, Defendants' motion for summary judgment is **DENIED**.

As previously ordered, "[e]xpert discovery shall close **120 days** after the Court's ruling [on Defendants' motion]." ECF No. 179 (emphasis added). The parties are further **ORDERED** to submit a joint status letter within **one week** of the close of discovery. The joint status letter shall describe the efforts the parties have made to settle the action; state whether the parties request a referral for settlement discussions before the assigned Magistrate Judge or through the District's Mediation Program; state the anticipated duration of a bench trial; identify any matters to which the Court ought to attend prior to scheduling such a trial; and propose dates within **three weeks** of the close of discovery when the parties are available to appear before the Court to participate in a post-discovery conference.

SO ORDERED.

Dated: September 27, 2024
New York, New York

DALE E. HO
United States District Judge